FILED
United States Court of Appeals
Tenth Circuit

May 7, 2010

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

KAREN ALLEN,

      Defendant - Appellant.

No. 09-8008

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. No. 2:07-CR-00239-WFD-14)**

David Kubichek, Assistant United States Attorney, District of Wyoming (Stephanie I. Sprecher, Assistant United States Attorney, and Kelly H. Rankin, United States Attorney, District of Wyoming, with him on the brief) for the Plaintiff - Appellee.

Jeffrey R. Edelman, Parker, Colorado, for the Defendant - Appellant.

Before **LUCERO, HOLLOWAY** and **MURPHY**, Circuit Judges.

**HOLLOWAY**, Circuit Judge.

Defendant-appellant Karen Allen was convicted by a jury of two counts related to dealing in methamphetamine. Ms. Allen was sentenced to 121 months' imprisonment on Count One and 48 months' imprisonment on Count 22, to be served concurrently. She

was also sentenced to five years on supervised release and was ordered to pay a special assessment of $200.00. She now brings this direct appeal from the convictions and the resulting sentence. Our jurisdiction is granted by 28 U.S.C. § 1291.

# I

Ms. Allen was one of fourteen persons named in a 24-count indictment. The conspiracy was alleged to have existed from January 2006 to September 2007. All fourteen defendants were named in Count One, which charged them with conspiracy to possess methamphetamine with intent to distribute it and conspiring to distribute methamphetamine. Ms. Allen was also charged in Count 22 with use of a telephone to facilitate a drug felony. Ms. Allen and co-defendant Esteban Cornelio-Legarda (Cornelio)[1] were the only defendants to go to trial on the charges. Several of the others named in the indictment testified at trial against them after having entered into plea agreements with the government. Only three of the government's witnesses testified about Ms. Allen, and only six of many intercepted telephone calls were relevant to her.

Jessica Myhre was the first witness at trial. She testified extensively about her dealings with several of the other conspirators, including Ms. Allen. Ms. Myhre was 28 years old at the time of trial and had lived in Riverton, Wyoming since the age of five. Ms. Myhre testified that she first used methamphetamine at the age of 14. She eventually became a heavy user of methamphetamine and also a seller of the drug. She testified that

---

[1]Mr. Cornelio was also convicted and has also appealed his conviction. His separate appeal is pending before this panel.

she occasionally used and sold other drugs, but methamphetamine was her primary drug for both use and distribution.

Although the conspiracy was alleged to have begun in January 2006, testimony at trial was focused, of course, on Mr. Cornelio and Ms. Allen, and no evidence was presented to show that they joined the conspiracy before 2007. In January 2007, Mr. Cornelio and Ms. Myhre began a relationship, and they soon began dealing methamphetamine together. She sold to him at first, but later he became her primary source – or at least one of her primary sources – for the drug. Ms. Myhre also lived for some time with Ashley Butner in 2007 and stayed sometimes at Ms. Allen's home. Ms. Butner was also a primary supplier of methamphetamine to Ms. Myhre, Myhre testified, but Ms. Butner also sometimes bought from Ms. Myhre.

As for Ms. Allen, Ms. Myhre said that she had known her for some time and considered her to be "like family" but had not seen her for about five years preceding 2007. Sometime in 2007 they were both at the home of another of the co-conspirators, and Ms. Allen asked Ms. Myhre why she had not been in touch for so long. Myhre testified that she told Allen that she was embarrassed because "I was a junkie, basically," and that Allen assured her that she was not concerned about that because she also took methamphetamine. (Myhre said that she did not recall exactly what Allen had said but that this was the import of it.)

Myhre testified that Allen then became one of her customers and Allen purchased methamphetamine from her a number of times. Myhre testified that on one occasion they

used the drug together, Myhre smoking it and Allen injecting it. ( Myhre did not actually see this but was told by Allen that she had done that.) Ms. Myhre also testified that Ms. Allen was re-selling some of the methamphetamine that Allen bought from her. On some occasions, Ms. Myhre said that she would call Ms. Allen and ask her to "round up money, meaning if she could call whoever she knew to have them bring the money to the house so that when I got there I could give her the meth[amphetmine] for the money." Accordingly, Myhre testified, when she arrived at Ms. Allen's house to deliver methamphetamine, there were sometimes other persons there.

Myhre named three women who had been at Ms. Allen's house to buy methamphetamine when she delivered it.[2] Ms. Myhre testified that she recalled having sold Ms. Allen one-half gram or one gram of methamphetamine on a couple of occasions. Myhre recalled one time when she sold Ms. Allen two grams on credit, accepting titles to Ms. Allen's vehicles as collateral. The titles were returned the next day when Ms. Allen paid for the drug. Ms. Myhre testified that she was sometimes with others when she went to Allen's house, and she named five people, including Ms. Butner and Ms. Susie Barr, both of whom also testified at trial.

During the course of the investigation of this case, law enforcement officials

---

[2]Ms. Allen called two of those women as defense witnesses, both of whom denied having taken part in any such transaction. As for the third person named by Ms. Myhre, "Bunny Clawson," one of those two defense witnesses and two other defense witnesses, one of whose last name was Clawson and one of whom is nicknamed "Bunny," testified that there was no such person. These three witnesses, who are sisters, said that the one nicknamed "Bunny," had never had the last name Clawson.

-4-

obtained court orders to monitor several telephones, including one that was used primarily by Mr. Cornelio but was also used by Ms. Myhre. During Ms. Myhre's testimony, the jury heard several recorded telephone conversations between Myhre and Ms. Allen, four of which occurred in a short period of time on the evening of June 9, 2007.[3] Ms. Myhre said that the calls all concerned methamphetamine that she was selling to Ms. Allen, although she admitted that the calls could have been about arranging a marijuana deal instead (as Ms. Allen would later testify in her defense). In all of these conversations, the participants avoided using the word methamphetamine or any other word that would unmistakably refer to drugs.

Ms. Myhre also testified regarding another taped telephone conversation with Ms. Allen which occurred one day after the four calls just discussed. Ms. Myhre testified that this call occurred while she was en route back to Riverton from Denver, Colorado, where she and Mr. Cornelio had gone to acquire more methamphetamine. Myhre testified that she had told Allen the purpose of the trip. Myhre also testified that, although she eventually sold Ms. Allen two grams of the methamphetamine she had acquired in Denver, there had been no prior arrangement between them about it.

Myhre testified that she stayed at Ms. Allen's house "quite frequently" during June 2007. During that time, Myhre's drug customers would often call for her on Ms. Allen's telephone and Ms. Allen sometimes took messages for Ms. Myhre from these callers.

---

[3]The indictment alleged that on that date Ms. Allen used a telephone to facilitate a drug crime. On appeal Ms. Allen raises an issue, discussed *infra*, about jury instructions on juror unanimity regarding these calls.

Ms. Myhre said that she only sold methamphetamine to Ms. Allen and never bought it from her, unlike most of the other indicted conspirators.

Indicted conspirator Susie Barr was the second witness who had contact with Ms. Allen during the conspiracy. Her contact was limited, however. Ms. Barr said that she never used methamphetamine with Ms. Allen, never bought methamphetamine from Ms. Allen, and never sold methamphetamine to Ms. Allen. Ms. Barr did say that she lived for a time with Ashley Butner and Jessica Myhre, and that she once accompanied Ms. Myhre when the latter went to Ms. Allen's house for the purpose of delivering three grams of methamphetamine to Ms. Allen. Immediately afterward, Ms. Myhre told Ms. Barr that they needed to deliver money to Ms. Butner.

Ms. Barr also testified that she frequently overheard Ms. Myhre's end of telephone conversations with Ms. Allen, who sometimes called two or three times in a day. After these telephone conversations, Ms. Myhre would say that she had to "go by" Ms. Allen's home. Ms. Barr said that Ms. Myhre would weigh a quantity of methamphetamine in preparation for going to Ms. Allen's house, or at other times Ms. Myhre would simply tell Ms. Barr that Ms. Allen had called to arrange buying more methamphetamine. During a two-week period, Ms. Barr said that these transactions occurred two or three times a day. Barr also testified that she had accompanied Myhre on one of her deliveries to Allen.

Ashley Butner testified that she lived with Jessica Myhre from the beginning of 2007 until about April or May of that year, and that Ms. Barr had lived with them for a couple of weeks near the end of that time. Ms. Butner admitted that she was actively

selling methamphetamine during 2007, prior to her arrest in September of that year. Mostly she acquired the methamphetamine from another source, but a couple of times she bought from Mr. Cornelio.

Ms. Butner testified that she sometimes provided transportation for Ms. Myhre when Myhre was selling methamphetamine, but most of the times Butner stayed in the car and did not witness the transactions. Ms. Butner recalled taking Ms. Myhre to Ms. Allen's house twice, and one of those times she went in the house with Myhre. Butner and Myhre went into a bedroom and smoked some methamphetamine at that time, but Ms. Allen was not in the room. Butner said that Myhre told her that she had delivered methamphetamine to Allen on that occasion, however. On another occasion, Ms. Butner testified, she put methamphetamine into a spoon for Ms. Allen, but she did not see Ms. Allen use the drug.

Ms. Butner testified that she sold methamphetamine directly to Ms. Allen twice. There were two other persons at Ms. Allen's house "waiting for drugs" on one of those occasions, Ms. Butner said. Those transactions involved one-half gram or one gram of the drug, according to Butner.

Defendant Allen testified at trial, denying any involvement in the conspiracy and explaining that one of the recorded telephone conversations was actually about her attempt to buy marijuana and not about methamphetamine at all. Other telephone conversations were completely innocent, she testified.

**II**

On appeal, Ms. Allen raises a plethora of issues.

**A**

Ms. Allen first contends that her rights under the Speedy Trial Act, 18 U.S.C. §§ 3161-3174, were violated. She does not allege a violation of her constitutional right to a speedy trial. Alleged violations of the Speedy Trial Act present legal questions which we review de novo. *United States v. Williams*, 511 F.3d 1044, 1049 (10th Cir. 2007). Underlying findings of fact are reviewed under the clearly erroneous standard, and a decision to grant an "ends-of-justice" continuance is reviewed for abuse of discretion. *Id.*

In this case, however, Ms. Allen's Speedy Trial Act issue is not supported by a recognizable legal argument. Ms. Allen's brief provides a very detailed list of various filings in the case. This list reflects many motions filed on Allen's behalf, including one to postpone trial, which at one time had been scheduled to begin on April 28, 2008.[4] After Ms. Allen asked for a continuance the court held a scheduling conference on April 28, 2008, at which time the court said that the date of August 18, 2008, was the next date that the judge could have at least a week available for this trial.[5] The court also made

---

[4]The case had been declared complex by the trial judge on October 19, 2007. Under 18 U.S.C. § 3161(h)(7), this declaration was part of the trial judge's "ends of justice" analysis. Allen apparently did not object to this finding of complexity by the court.

[5]Filing a motion to continue the trial date is not a waiver of the defendant's Speedy Trial Act rights. *See Zedner v. United States,* 547 U.S. 489 (2006); *United States v. Williams*, 511 F.3d 1044 (10th Cir. 2007).

"ends of justice" findings at that time. Ms. Allen's attorney stated that the schedule was satisfactory to him, and he made no objection to the court's findings.[6]

Ms. Allen's appellate brief fails to support her appellate proposition with a legal argument, and fails to explain her position on the facts and posture of the case. Ms. Allen's brief does not include any explanation or calculation to support her position that the Speedy Trial Act "clock" had expired. We are not told which time periods she thinks should have been excluded and which included in the running of the clock, or when, in her view, the clock expired.

The district court did make ends-of-justice findings, but the court's denial of Ms. Allen's motion to dismiss under the Speedy Trial Act adopted the government's speedy trial calculations, under which less than seventy days of non-excludable time had passed when trial actually began. Ms. Allen has not addressed the government's calculation, although with respect to pending motions her brief does include a statement declaring, without supporting analysis, that the thirty-day period for ruling "had already run on all or most of the motions."

The reference is to the Act's provisions which exclude from the Speedy Trial Act's basic seventy-day period, time during which motions are pending. When a motion requires a hearing, the Act excludes the entire time between the filing of the motion and the conclusion of the hearing. *See Henderson v. United States*, 476 U.S. 321, 329 (1986).

---

[6]In her appellate brief, counsel for Ms. Allen says that this was "too little, too late." No explanation is given for why the findings were "too little," nor why they were "too late," coming soon on the heels of Ms. Allen's own motion for continuance.

If a motion does not require a hearing, "the Act excludes time through the period of its prompt disposition, but only if that period does not exceed thirty days from the date the motion is taken under advisement." *Williams*, 511 F.3d at 1048.

It is not the task of this court to make a party's argument for her. Ms. Allen has not taken a position as to which, if any, of the myriad of motions filed in this case required a hearing. She has not provided the dates when the various motions were taken under advisement. She simply makes the bald assertion that the Speedy Trial Act clock expired sometime before her trial notwithstanding the many motions filed in the case. We decline the apparent invitation to analyze the record for Ms. Allen to determine whether a violation occurred. That task was for her counsel and it has not been performed. We therefore hold that no Speedy Trial Act violation has been shown.

**B**

The next issue concerns an exhibit that the government used at trial but which was not admitted into evidence. The exhibit is an array of photos of the fourteen persons alleged in the indictment to have been involved in the methamphetamine distribution conspiracy. The photos are arranged in three rows. On the top row are Mr. Cornelio, Ms. Jessica Myhre, Ms. Olivia Weeks (who is Mr. Cornelio's sister), and Ms. Butner.

Ms. Allen's photo is the first of six in the middle row of the array. The prosecutor said at the outset that the array of photos was only intended to aid the jury in keeping track of some of the names they would hear during the course of the trial.

As our discussion will show, the trial judge was very troubled by this photo array,

-10-

for several reasons. The word "sources" is at the top of the chart in large letters, with "customers" at the bottom and arrows supposedly representing the flow of drugs. In addition to that overreaching, the chart was printed on paper that had the scales of justice in the background, and the photo of Mr. Cornelio, unlike all the others, looked like a mug shot. Not only that, but he is shirtless (though only the top of the torso is shown) and tattoos are visible.

The prosecutor referred to the chart in her opening statement without objection. During the testimony of her first witness, Ms. Myhre, the prosecutor moved for admission of the chart in evidence. Counsel for Ms. Allen objected on the ground of lack of foundation. Counsel for Mr. Cornelio objected too, and he suggested that the array could be used as a demonstrative aid but said that it should not be admitted in evidence. The prosecutor indicated that she would be satisfied to use the array only as a demonstrative aid.

The trial judge ruled that the chart would not be admitted in evidence and noted that it was "a comment on the evidence." He ruled that the array could be used by the prosecution as a visual aid. The judge immediately instructed the jurors that it was up to them to determine if the evidence supported the label "sources" used on the chart. The chart was then used in direct examination of the first witness, and in the cross-examination of that witness by counsel for Mr. Cornelio.

At a later break, the trial judge *sua sponte* expanded on his concerns about the array, including the scales of justice and, particularly, the mug shot of Mr. Cornelio,

-11-

which the judge described as a "stereotypical picture of a Central L.A. gangbanger." The judge ruled that the array could not be displayed again without substantial changes. The judge also declared his intention to give an additional cautionary instruction, and invited both sides to suggest language for the instruction after a break. After the break, instead of suggesting language for a cautionary instruction, defendants moved for a mistrial. The judge denied the motion but instructed the prosecution not to use the chart again unless some of its more prejudicial features had been removed. The prosecution did not attempt to correct the problems identified by the judge, but simply removed the array and proceeded without it for the remainder of the trial. The court gave a second cautionary instruction to the jury about the array.

On appeal, Ms. Allen argues that the photo array was hearsay and highly prejudicial. "A reasonable conclusion," she says, "was the Defendant was guilty of other wrongs or even wrongs in this case." It is not at all clear to us what counsel means by "other wrongs." Ms. Allen also contends that the chart denied her right of confrontation.

We share the concerns of the trial judge about this photo array and commend his diligent attention to the matter. But both defendants acquiesced in use of the array until the judge put a stop to it, so our review is only for plain error. In view of the trial judge's careful instructions to the jury and the fact that the array only appeared on the first two days of a two-week long trial, we are convinced that any error was harmless. Fed. R. Crim. P. 52(a).

**C**

Ms. Allen asserts that she was denied a fair trial by the trial court's failure to require the prosecution to make timely and full disclosures required under the Jencks Act (18 U.S.C. § 3500), *Brady v. Maryland*,[7] and *Giglio v. United States*.[8]  Like many of the arguments in this appeal, this one consists of bold, but frustratingly vague, assertions unexplained by reference to more specific facts and unsupported by anything resembling a cogent legal argument.

For example, this portion of Ms. Allen's appellate brief begins with the bald declaration that the government "has a history in this case of discovery violations." Apparently counsel again expects this court to scour the voluminous record in hopes of determining whether violations occurred.  That task, were we willing to undertake it, would be the more daunting in the absence of specific contentions by Ms. Allen and in the absence of trial court findings that any specific violations occurred.  And the trial judge very clearly believed that the prosecution had more than fulfilled its obligations to the defense, remarking at one juncture that he could not "sanction the government for providing more discovery than is required by law."

From our review of the record, it appears that there was no violation of the Jencks Act.  All statements of witnesses were provided, as the Jencks Act requires, following their testimony on direct examination *at the latest*; statements of a number of witnesses had been provided well before that deadline.

---

[7]373 U.S. 83 (1963).

[8]405 U.S. 150 (1972).

The prosecution's obligation to provide material under *Brady* and *Giglio* is limited to material favorable to the defense. Notwithstanding Ms. Allen's dramatic assertions, no violations of the prosecution's disclosure obligations have been identified.

Ms. Allen makes a similar and related assertion elsewhere in her brief that we will address here. She says that her attorney's investigator learned a few days before trial that the government had intimidated at least one and possibly two potential witnesses. Laurie Smith had been cooperating with the investigator but then was allegedly threatened by one of the government agents who interviewed her. Samantha Gloy had not been cooperating with the defense, but appellant suggests that she may also have been intimidated. We are not given any specifics about such alleged intimidation. Defendant moved for sanctions on the first day of trial on this ground. Neither of these women were called to testify for the prosecution. Ms. Allen chose not to call either of them as witnesses because, she says, their testimony was "tainted." On the day of sentencing, the court denied Ms. Allen's motion for sanctions.

Ms. Allen's brief provides pages of quotes about the importance of the government following the law and the special duties of prosecutors. This is followed by a discussion of the analysis of this issue in general and discussion of some leading cases. However, there is nothing shown about the alleged intimidation to permit this court to assess whether it actually occurred, and if so whether it was serious enough to require a remedy. Nor is there any suggestion as to what testimony Ms. Smith and Ms. Gloy might have provided but for the alleged interference.

To support her claim, Ms. Allen needed to provide evidence that there was actual government misconduct in threatening or intimidating potential witnesses and that such witnesses otherwise would have given testimony both favorable to the defense and material. *Griffin v. Davies*, 929 F.2d 550, 553 (10th Cir. 1991) (citing *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)). Ms. Allen did not satisfy either of these two requirements. There is no hint as to what testimony these witnesses might have given, and no evidentiary support for the claim of misconduct.

**D**

At trial the government presented the testimony of a chemist, Roger Ely, employed by the United States Drug Enforcement Administration. This testimony established that the few small quantities of suspected methamphetamine that had been seized during the investigation did indeed contain the illicit substance. The testimony also was used to establish an estimated concentration of methamphetamine in the substances, which were mixtures of methamphetamine and another substance. In closing argument, the prosecution used this estimate of purity to assert that the conspiracy involved more than 50 grams of "actual methamphetamine" as charged. (That argument was also based on an estimate by the lead federal agent in the investigation of the total quantity of the mixture, an estimate that the agent derived from the testimony of the witnesses involved in the conspiracy.)

Ms. Allen now asserts that she was prejudiced by late and incomplete disclosure before trial regarding the testimony that Mr. Ely was expected to give. She also contends

that the trial judge erred by failing to hold a *Daubert* hearing.[9]  In *Daubert*, the Supreme

Court held that trial courts have an obligation as "gatekeepers" to insure that proffered

expert testimony is relevant and sufficiently reliable to be of assistance to the jury.  We

review *de novo* whether the trial court properly performed its role as "gatekeeper," and

review for abuse of discretion the manner in which the role is performed.  *Bitler v. A.O.*

*Smith Corp.*, 391 F.3d 1114, 1119 (10th Cir. 2004).

Ms. Allen claims that the trial judge found that the chemist's testimony was not

subject to analysis under *Daubert*.  We disagree.  What the trial judge said, in the passage

of the trial transcript cited by Allen, is that he did not perceive that she had made a

challenge to the proffered testimony under *Daubert*.  This was in the context of counsel

for Ms. Allen again complaining that the government had not provided all the discovery

material to which he felt entitled in his trial preparation.  As to that complaint, the judge

ordered Mr. Ely to produce his entire file at trial, in addition to the apparently voluminous

papers already produced, and that was done.

As for the possibility of a *Daubert* challenge, the judge did not simply brush off

the suggestion but offered counsel the opportunity to develop such a challenge.  Thus, at a

sidebar conference, in response to counsel's argument, the judge said:

> I'll let you briefly examine the witness out of the presence of the jury,
> and I'll make whatever findings.  I don't see this as a *Daubert* issue.  At
> least as it's been presented to me I don't see it as such.  But out of an
> abundance of caution, I'll give you a few minutes with this witness.

---

[9]*See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

After this statement by the trial judge, and after the judge had ordered Mr. Ely to produce his entire file, the judge observed that his expectation was that the defense would "ship it off to the expert that I've ordered that you could use for their assessment of the methodology employed by this witness. Is that right?" To which counsel replied, "Yes."

Counsel did not take up the court's offer to question the witness outside the presence of the jury and chose not to press the *Daubert* issue thereafter. Because counsel was given the opportunity to support his request for a *Daubert* hearing and elected not to do so, we find no error in the trial court's decision that such a hearing was unnecessary under the circumstances.

Moreover, Ms. Allen has not made any suggestion, much less a showing, that either earlier disclosure of Mr. Ely's methods or a *Daubert* hearing on the reliability of his methods could somehow have been used to her advantage to exclude the testimony or to more effectively cross-examine Mr. Ely. Accordingly, even if we were to assume *arguendo* that some error occurred, we could only conclude that it was harmless error.

**E**

The next argument that we will address, quite briefly, is based on two facts: first, the indictment charged Ms. Allen with conspiring to possess with intent to distribute and to distribute methamphetamine, a schedule II controlled substance, in violation of 21 U.S.C. § 841; second, the text of 21 U.S.C. § 812 lists methamphetamine as a schedule II drug, only when it is in the form of an "injectable liquid." Because there was no evidence at trial of any of the methamphetamine having been in the form of an injectable liquid,

-17-

Ms. Allen asserts that the evidence was insufficient to support the conviction on Count One, or that the indictment was "fatally worded."

This argument is completely without merit. When the issue arose at trial, the government pointed out that the initial classifications in section 812 were expressly made subject to later amendment, that section 811 granted authority to the attorney general to make amendments to the schedules, and that the attorney general had exercised that authority decades before this case arose, placing all methamphetamine under schedule II. *See* 21 C.F.R. § 1308.12. We have recognized that methamphetamine is a schedule II drug since at least 1979. *See United States v. Kaiser*, 599 F.2d 942 (10th Cir. 1979); *see also United States v. Zamora*, 784 F.2d 1025, 1029-30 (10th Cir. 1986); *United States v. Sullivan*, 967 F.2d 370, 372-74 (10th Cir. 1992) (rejecting an argument that the procedure used *in 1971* to effect the amendment was flawed); *United States v. Lafoon*, 978 F.2d 1183, 1184-85 (10th Cir. 1992).

Ms. Allen's contention is frivolous and requires no further discussion.

## F

In Count 22, Ms. Allen was charged with using a telephone on or about June 9, 2007, to facilitate the conspiracy alleged in Count 1. Use of a communication facility knowingly or intentionally to cause or facilitate a drug felony is a violation of 21 U.S.C. § 843(b). That statute also provides that "[e]ach separate use of a communication facility shall be a separate offense . . . ." At trial, the prosecution introduced in evidence four recorded telephone calls between Jessica Myhre and Ms. Allen, all of which occurred

between approximately 9:40 p.m. and 10:45 p.m. on June 9, 2007.

Ms. Allen requested that the trial judge instruct the jurors that in order to convict on Count 22 they would have to unanimously agree on which of the four telephone calls constituted the offense. The trial judge disagreed and gave the jurors only the general direction that each of their verdicts must be unanimous. On appeal, Ms. Allen contends that she was entitled to the specific instruction she requested and asks us to reverse her conviction on the telephone count for the trial court's refusal to give that instruction. When reviewing claims of error in regard to jury instructions, we review the instructions as a whole *de novo* to ensure that the applicable law was correctly stated and review for an abuse of discretion a trial court's refusal to give an instruction as specifically requested by a party. *See United States v. McClatchey*, 217 F.3d 823, 834 (10th Cir. 2000).

The requirement of jury unanimity is well established not only in our law but in our culture. Yet its familiarity does not mean that it is fully understood. A defendant in a criminal case may not be convicted unless the jury unanimously finds her guilty, but under some circumstances it is a challenging problem to discern exactly what the jurors must unanimously decide. We face such circumstances in this case.

"The Supreme Court has never defined what is meant by a unanimous jury verdict." *United States v. Phillips*, 869 F.2d 1361, 1375 (10th Cir. 1988) (Seymour, J., dissenting). In fact, the Court has cited the "impracticability of trying to derive any single test for the level of definitional and verdict specificity permitted by the Constitution" and observed that "instead of such a test our sense of appropriate specificity is a distillate of

the concept of due process with its demands for fundamental fairness, and for the rationality that is an essential component of that fairness." *Schad v. Arizona*, 501 U.S. 624, 637 (1991) (plurality opinion; internal citation omitted).

The contours of the debate are sketched out in *Richardson v. United States*, 526 U.S. 813, 817-820 (1999). As the Court noted there, "a federal jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element [of an offense], say, which of several possible means the defendant used to commit an element of the crime." 526 U.S. at 817. On the other hand, the *Richardson* Court held that the jury had to be unanimous as to the elements of the offense.

Thus the Court employed a conceptual framework in which the means by which a crime is committed is something on which juror unanimity is not always required,[10] but "a jury in a federal criminal case cannot convict unless it unanimously finds that the Government has proved each element." 526 U.S. at 817. Thus we have interpreted *Richardson* as directing us to analyze the issue in the light of a "means/element spectrum." *United States v. Powell*, 226 F.3d 1181, 1196 (10th Cir. 2000).

If the jurors must be unanimous as to each element of a federal crime, then surely they must be unanimous as to *which* crime was committed, one might think. Yet, several

---

[10]The Court in *Richardson* did note, however that "the Constitution itself limits a State's power to define crimes in ways that would permit juries to convict while disagreeing about means, at least where that definition risks serious unfairness and lacks support in history or tradition." 526 U.S. at 820 (citing *Schad v. Arizona*, 501 U.S. at 632-33, and *id*. at 651 (Scalia, J., concurring)).

-20-

of our cases would call that inference into question.  For example, our precedents hold that the crimes of mail fraud and wire fraud encompass separate offenses:  "Although largely overlapping, a scheme to defraud and a scheme to obtain money by means of false or fraudulent pretenses, representations, or promises, are separate offenses." *United States v. Cronic*, 900 F.2d 1511, 1513 (10th Cir. 1990).  Nevertheless, in *United States v. Freddette*, 315 F.3d 1235 (10th Cir. 2003), we held that not instructing the jury that it must unanimously agree which of these two offenses had been committed was not plain error, without determining whether it was error at all.

Moreover, in *United States v. Haber*, 251 F.3d 881 (10th Cir. 2001), the same issue was raised but in that case the defendant had requested an instruction at trial.  We rejected the challenge to the conviction on the ground that the defendant should have objected prior to trial to the duplicitous indictment.[11]

We have not found, nor have the parties cited, any reported case under 21 U.S.C. § 843(b) that appears to be directly on point.  The federal mail and wire fraud statutes would seem to be closely analogous to section 843(b) in that several communications may be chargeable as separate crimes even when they all relate to a single scheme.  But caselaw under these statutes is also sparse, if existent at all, when it comes to addressing the question of the level of specificity required for a valid verdict.

---

[11]In the instant case, the government also suggests that Ms. Allen has waived this instruction on unanimity issue by failing to object to a duplicitous indictment.  But we see no basis for the assertion that the indictment in this case was duplicitous.  To the contrary, the indictment plainly alleged a single crime.

In the end, we need not decide if it was error to refuse the specific unanimity instruction because, complying with the mandate of Fed. R. Crim. P. 52(a), we find that any such error was harmless. The assumed error was failure to give an instruction requiring the jury to agree unanimously as to which telephone call constituted the crime. We have noted that an instruction that did not require unanimity on all elements of an offense is a violation of the constitutional right of due process. *United States v. Holly*, 488 F.3d 1298, 1307 n.7 (10th Cir. 2007). Accordingly, for purposes of our analysis, we will assume that the error alleged here presents a constitutional issue. A constitutional error can be held harmless only if "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id*. at 1307 (quoting *Neder v. United States*, 527 U.S. 1, 15 (1999)).

We conclude that the error here, if any, was harmless beyond a reasonable doubt. As noted, the four telephone calls that were recorded and played for the jury all occurred within a very short time on one evening. Three of them involved arranging for Ms. Myhre to come to Ms. Allen's house; in the fourth call, which occurred after Ms. Myhre had been at Ms. Allen's, Ms. Allen asked Ms. Myhre if she could return. Ms. Myhre testified that all of the telephone calls were about arranging for her to sell methamphetamine to Ms. Allen.[12] Ms. Allen testified that none of the calls were for that

---

[12]As noted *supra*, on cross-examination Ms. Myhre admitted that there was a possibility that the calls concerned attempting to arrange a marijuana purchase, as Ms. Allen later testified. But Ms. Myhre maintained that to the best of her memory the calls were about methamphetamine.

purpose. Obviously, the jury did not credit Ms. Allen's testimony.

We do not think that a rational juror could have parsed the testimony in such a way as to credit Ms. Myhre's testimony as to some of the calls but not as to others. Ms. Allen's testimony was inconsistent and unconvincing. For example, Ms. Allen's ex-husband (who was living with her) had answered the telephone when Ms. Myhre initiated the first of these four calls. Mr. Allen and Ms. Myhre chatted amicably for a moment before Ms. Allen took the telephone. The government had (inadvertently, we presume) numbered the recordings as exhibits consecutively and in chronological order, except that the first exhibit number was assigned to the second call rather than the first (and vice-versa). In the second call, Ms. Allen told Ms. Myhre that "everything is copacetic here." Asked about this phrase during her direct examination, Ms. Myhre testified that this meant that Ms. Allen had the money to pay for the methamphetamine that she expected Ms. Myhre to deliver. Ms. Allen, apparently thinking that this was the first of the four calls, testified that Mr. Allen had been angry with Ms. Myhre and that the reference to "everything" being "copacetic" meant that Mr. Allen was over his anger. Because the evidence showed that less than twenty minutes before that call, Mr. Allen and Ms. Myhre had been chatting amicably immediately before Mr. Allen handed the telephone to Ms. Allen, the jury undoubtedly concluded that Ms. Allen's testimony was false on that point.

As for the fourth conversation, in which Ms. Allen asked Ms. Myhre if she could return, Ms. Allen testified that this conversation was about taking care of Ms. Myhre's young daughter, who was at Ms. Allen's house at the time. But nothing in the

-23-

conversation refers to the child.  Moreover, in this conversation Ms. Myhre says that she is heading in the direction of Ms. Allen's house "if you can get some money there."

In short, because the four telephone calls occurred within a very short time span (about 62 minutes) and all involved Ms. Myhre coming to Ms. Allen's house within that time span (or returning to the house), the calls were very clearly related rather than separate incidents.  The testimony suggested a sharp choice – either all the calls were about methamphetamine, as Ms. Myhre testified, or none were, as Ms. Allen testified. The jury was thus necessarily convinced beyond a reasonable doubt that the calls were all about methamphetamine.  Any error in refusing to give an instruction requiring specific unanimity was clearly harmless beyond a reasonable doubt.

**G**

Ms. Allen argues that the district court erred in denying her motion for new trial based on newly discovered evidence.  Some additional context is necessary for our discussion of this issue.

As noted, Ms. Allen testified at trial, denying any involvement in the methamphetamine dealing.  She testified that at least one of the recorded telephone conversations which had been heard by the jury involved an attempt by her to buy marijuana, not methamphetamine, from Ms. Myhre.  Ms. Allen explained in her testimony that she had resorted to trying to buy marijuana from Ms. Myhre because her usual source for that drug, a man named Albert Paige, had recently been arrested.

After the defense had rested, the prosecution called Special Agent Hanson of the

Wyoming Division of Criminal Investigation as a rebuttal witness. Agent Hanson

testified that Mr. Paige had been arrested after the June 2007 telephone calls. Paige's

arrest, the officer testified, had come after law enforcement had arranged for a

confidential informant to buy marijuana from Paige. That transaction had occurred in

Riverton, where Ms. Allen lived, on June 13, 2007, just four days after the telephone calls

between Ms. Myhre and Ms. Allen. Mr. Paige was not arrested until late August 2007.

Ms. Allen alleges that it was only after trial that she learned that Paige had also been

arrested in 2006 for possession of marijuana.

Ms. Allen now asserts that Agent Hanson and the prosecutors knew or should have

known about the 2006 arrest and that the prosecution had a duty to disclose the

information. This appears to be a contention that the prosecution failed to discharge its

duties under *Brady v. Maryland*, 373 U.S. 83 (1963).

To succeed on a motion for new trial under *Brady*, a defendant must show that the

prosecution suppressed evidence that was favorable to the defendant and that the evidence

was material. *United States v. Velarde*, 485 F.3d 553, 558 (10th Cir. 2007).[13] Evidence is

material, under this analysis, "only if there is a reasonable probability that, had the

evidence been disclosed to the defense, the result of the proceeding would have been

---

[13]We have applied a five-factor analysis to motions for new trial based on newly discovered evidence when there is no contention that the evidence had been suppressed by the prosecution. *See United States v. Gwathney*, 465 F.3d 1133, 1144 (10th Cir. 2006). We need not decide in this case whether the three-factors from *Velarde* set out in the text supplant or complement those factors when suppression by the prosecution is alleged, as the claim fails under any test.

different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id*. at 559 (quoting *United States v. Robinson*, 39 F.3d 1115, 1118 (10th Cir. 1994)).

Ms. Allen argues that the fact of Mr. Paige's 2006 arrest, had it been disclosed, would have supported her claim that she had to resort to Myhre as a source for marijuana, while the rebuttal testimony by Agent Hanson about the arrest of Paige shortly after the incriminating telephone calls between Myhre and Allen severely undercut her testimony. Although the allegedly newly discovered evidence would have given some support to Ms. Allen's testimony, we are confident that there is not a reasonable probability that the result of the trial would have been different.

As we have already shown, some of Ms. Allen's other testimony about the meaning of her four telephone conversations with Ms. Myhre was not credible.  More to the point, however, the fact of Mr. Paige's prior arrest would have given only very meager support to her claim that he had stopped selling marijuana at the time of the telephone calls because the prosecution's rebuttal evidence showed that Paige had sold marijuana a very short time after those calls.  Thus, even with knowledge that Mr. Paige had been arrested on a marijuana charge a year earlier, the jury would have been very unlikely to credit Ms. Allen's testimony that Paige had stopped selling marijuana because of that arrest when the prosecution's uncontested rebuttal evidence showed that Paige *was* selling marijuana at the relevant time.

There is no reasonable likelihood that the newly discovered evidence would have

-26-

led to a different verdict. We conclude, therefore, that there was no error in denying the motion for new trial.

## H

Ms. Allen finally challenges the sentence imposed by the district court. She asserts that the court should have granted her a "safety valve" departure from the mandatory minimum sentence and that her offense level should have been lowered because she was only a minimal participant in the conspiracy. These contentions are without merit.

As to the contention that she was only a minimal participant, Ms. Allen offers almost no discussion other than asking this court to consider the record as a whole and the involvement of the other parties compared to Ms. Allen. The record as a whole does not support the contention. As we have noted *supra*, there was testimony that Ms. Allen was calling for drugs several times a day in one period of approximately two weeks. There was evidence that she helped "round up" funds with which to buy quantities of methamphetamine for those at a higher level in the conspiracy and that she was re-selling at least some of the methamphetamine she purchased. There is no error in denying the reduction for her role in the offense.

To qualify for a "safety valve" reduction under 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2, a defendant must meet five conditions. One of these conditions is to truthfully provide not later than the sentencing hearing all information and evidence she has regarding the offense and the course of conduct that was part of a common scheme or

plan. In this case, the district judge found that Ms. Allen had not satisfied that condition. This finding followed Ms. Allen's testimony at the sentencing hearing. In her testimony, Ms. Allen continued to deny any involvement in the crimes for which she had been found guilty and maintained her innocence. She testified that she had heard additional information about the conduct of Ms. Myhre while she had been incarcerated during the months between trial and sentencing.

We review the district court's factual findings pertaining to this issue only for clear error. *See United States v. Cervantes*, 519 F.3d 1254, 1256 (10th Cir. 2008). Here, the district court's finding could only be clearly erroneous if Ms. Allen were innocent of the charges on which she had been convicted. In other words, it is completely frivolous to suggest that the district court's finding was clearly erroneous.

**Conclusion**

The convictions and sentence are affirmed.