FILED
United States Court of Appeals
Tenth Circuit

April 4, 2011

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

KENNETH DEAN STURM,

      Defendant - Appellant.

No. 09-1386
(D.C. No. 1:06-CR-00342-LTB-1)
(D. Colo.)

------------------------------------------------------

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

CHRISTOPHER ADAM DAYTON,

      Defendant - Appellant.

No. 09-5022
(D.C. No. 4:07-CR-00076-TCK-1)
(N.D. Okla.)

**ORDER GRANTING
REHEARING EN BANC**

Before **BRISCOE,** Chief Judge, and **KELLY, LUCERO, MURPHY, HARTZ, O'BRIEN, TYMKOVICH, GORSUCH, HOLMES,** and **MATHESON,** Circuit Judges.

Today, the court issued Order & Judgments in numbers 09-1386, United States v.

Sturm, and 09-5022, United States v. Dayton. Those decisions were issued

simultaneously.  The appeals present a common and important issue, and the court has determined that for purposes of consistency the matters should be reheard by the entire *en banc* court.  Accordingly, we *sua sponte* order *en banc* rehearing in both these appeals, and vacate both decisions.  The parties are directed to brief the following issue:

> Whether the jurisdictional element of 18 U.S.C. §§ 2252 and 2252A requires proof that the particular image of child pornography that is the identified object of the defendant's statutorily proscribed possession, receipt, or distribution traveled in interstate or foreign commerce, or whether it is sufficient to establish the jurisdictional element to show that the original or some other iteration of that image traveled in interstate or foreign commerce at some point prior to the defendant's alleged commission of the charged crime?  In other words, does the term "visual depiction," as employed in 18 U.S.C. §§ 2252 and 2252A, refer specifically to the particular image possessed, received, or distributed by the defendant, or does it instead refer to the substance of an image of child pornography and thereby encompass not only the particular image possessed, received, or distributed by the defendant, but also any prior generations of that image, including the original?

Each separate party may file a brief on the issue identified above, but we urge counsel on the same sides to coordinate their arguments to reduce repetition.  The supplemental briefs should be filed electronically in the respective appeals.  That is, the parties should file their briefs in their original case numbers only.  They need not file in both case numbers.  The supplemental briefs shall be no longer than 20 pages in a 13 point font and the optional reply briefs shall be no longer than 10 pages in a 13 point font.

The appellants shall file their supplemental briefs on or before May 25, 2011.  The appellees shall file their response briefs within 30 days of those submissions.  The

2

appellants may file optional reply briefs within 14 days of service of the government's briefs.

Entered for the Court
ELISABETH A. SHUMAKER
Clerk of Court

by:   Douglas E. Cressler
      Chief Deputy Clerk

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

CHRISTOPHER ADAM DAYTON,

      Defendant-Appellant.

No. 09-5022
(D.C. No. 4:07-CR-07-00076-TCK-1)
(N.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, Chief Judge, **HOLLOWAY**, and **HOLMES**, Circuit Judges.

Defendant-Appellant Christopher Adam Dayton brings a sufficiency-of-the-evidence challenge to his convictions for distributing and possessing child pornography, in violation of 18 U.S.C. § 2252(a)(2) and (a)(4)(B). Mr. Dayton does not dispute that he distributed and possessed child pornography. Rather, Mr. Dayton argues that, because the government did not offer evidence that the images and videos charged in the indictment had traveled in interstate or foreign commerce, the government failed to offer sufficient proof of the requisite jurisdictional nexus of a movement across state lines under *United*

---

[*]     This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

*States v. Shaefer*, 501 F.3d 1197 (10th Cir. 2007). Generally, in *Schaefer*, we held that "the government was required to prove that any Internet transmissions containing child pornography that moved to or from [the defendant's] computer crossed state lines" and noted that "the government offered no proof that *the particular images* on the CDs in question moved across state lines." *Id.* at 1202, 1206 (emphasis added).

Thus, Mr. Dayton contends that evidence showing original photographs or videos that contain the charged images were produced outside of the state of Oklahoma is not sufficient under *Schaefer*; instead, the government must prove that the *particular* images stored on and downloaded from his computer moved in interstate or foreign commerce. Mr. Dayton urges us to reverse and enter a judgment of acquittal on both counts. In the alternative, he argues that the district court improperly instructed the jury on the element of distribution.

Exercising jurisdiction under 28 U.S.C. § 1291, we **REVERSE** Mr. Dayton's convictions and **REMAND** the case to the district court with instructions to **VACATE** its judgment and enter a judgment of acquittal.

## I. Background

On March 30, 2007, in Tulsa, Oklahoma, FBI Special Agent Cecchini, who is assigned to the FBI's Innocent Images National Initiative, accessed the peer-to-peer ("P2P") program LimeWire through the Internet as part of an undercover investigation into child pornography. LimeWire is a free-access file-sharing program that allows users to make files available to all other LimeWire users by placing them in a shared file folder.

Any LimeWire user may access that folder to download files.[1]  LimeWire provides users with a search function, involving the use of keywords, that allows them to search for particular types of files.  When a LimeWire user locates a file he wishes to download, LimeWire automatically will find all of the users who possess that file in their shared folders and will download parts of the file from all of them, thereby increasing the download speed.  The FBI has a specialized version of LimeWire that circumvents the usual downloading process and allows agents to download the file from only one person "so that [it] can definitively say that this one person, this one [Internet Protocol ("IP")] address offered that file."  R., Vol. II, Pt. 1, Tr. at 110.[2]

Using LimeWire, Agent Cecchini ran a keyword search for "8 yo girl," a term associated with child pornography that refers to an eight-year-old child.  The search revealed a file matching that description belonging to an IP address in Tulsa, Oklahoma.  That IP address had been assigned by Internet service provider Cox Communications, and the shared folder contained 323 shared files.  From the shared folder associated with the Tulsa IP address, Agent Cecchini downloaded three complete and one partial video files that appeared to contain child pornography.  With that information, agents issued a

---

[1]      Other LimeWire users may not add to another user's shared folder; they may only access that folder for downloads.  This means that if a file is in a LimeWire user's shared folder, then that user put it there.

[2]      Agent Cecchini testified that an IP address is assigned by an Internet service provider and is unique to a computer such that no two computers share the same IP address.

subpoena to Cox Communications, which provided them with subscriber information for that IP address. Agents thereafter located the physical address of the residence associated with the IP address and obtained a search warrant.

On the morning of April 18, 2007, eleven FBI agents and other personnel executed the search warrant at Mr. Dayton's residence, which he shared with other family members. Mr. Dayton acknowledged that the Cox account and IP address were his and admitted that "he'd been downloading child pornography and using LimeWire for about three months." *Id.* at 135. Mr. Dayton also wrote a statement, in which he confessed that "about 3-4 months ago I started to use [L]ime[W]ire and axedentle [sic] saw child porn and started to download it. I hated myself for it and deleted it[,] but I download[ed] it agen [sic] and I'm sory [sic]. And [I] burned it to 3 cds." R., Vol. I, Pt. 1, at 90 (Attach. to Mot. Suppress, filed Mar. 21, 2008). Agents seized a computer and two hard drives from the Dayton home, along with 169 CDs and DVDs. A forensic examiner for the FBI later discovered pictures and video files constituting child pornography on the hard drives and CDs.

On May 9, 2007, Mr. Dayton was charged in a two-count indictment with knowingly distributing or attempting to distribute visual depictions of minors engaged in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(2), and knowingly possessing or attempting to possess visual depictions of minors engaged in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(4)(B). On March 21, 2008, Mr.

Dayton moved to dismiss the indictment for failure to establish the interstate commerce nexus of either charge.

Mr. Dayton argued that Cox Communications was solely an intrastate Internet provider. Although he acknowledged that it was possible that the government could have additional evidence of the interstate nexus in its possession—which it had not shared with him but which it planned to offer at trial—he contended that if the government intended to rely only upon the evidence concerning Cox Communications, that evidence was insufficient to prove an interstate nexus under *Shaefer*. Mr. Dayton also moved to suppress his statements to police, arguing that they were obtained in violation of the Fifth and Sixth Amendments. The district court took both motions under advisement until the close of the government's case, and the case proceeded to a three-day jury trial.

At trial, Agent Cecchini testified about the investigation that led to Mr. Dayton's indictment. The jury also was shown the four videos that Agent Cecchini downloaded from Mr. Dayton's computer through LimeWire. While those videos played, Agent Cecchini described the sexual acts depicted. He testified that the videos appeared to depict adults involved in various sexual acts with minor children. Another witness, Dr. Deborah Lowen, a Tulsa area pediatrician specializing in the area of child-abuse pediatrics, testified that the children depicted ranged in age from approximately five to fourteen years of age.

The following evidence, which is relevant to the question of whether the images moved across state lines, was adduced at trial. Agent Cecchini testified that he had seen

one of the videos "many times" and that the minor female (referred to as "Vicky") in the video was from Richland, Washington.  R., Vol. II, Pt. 1, Tr. at 123.  He also testified that he had seen all of the videos before, and that he previously had received these images from foreign countries.  However, Agent Cecchini testified that he did not know if Mr. Dayton had distributed any of the videos to anyone else and did not know where Mr. Dayton had gotten the images.  Agent Cecchini also stated that agents knew that the Cox Communications IP address was located in Tulsa, Oklahoma, but he did not know where Cox Communications's server was located.  Agent Cecchini acknowledged that in transferring files from Mr. Dayton's computer to the FBI's office in Tulsa, the images did not at that time move in interstate commerce.

Another witness for the government, FBI Special Agent Trifiletti, a specialist in victim identification, testified that he had identified the minors in three of the images recovered from Mr. Dayton as girls from Paraguay who were ten and twelve years old.  Agent Trifiletti testified that the images were manufactured in Paraguay and that the FBI knew the identity of the man who had taken the pictures and disseminated them for profit.  He stated that, in order for the Paraguayan images to be found on a computer in Oklahoma, they necessarily had to travel in interstate and foreign commerce.  He explained:

> I can see no way for it [to get from Paraguay to the United States] other than to have been sent by Internet, mail, airplane.  Maybe an analogy is appropriate; if we had a photograph taken of this courtroom today and it wound up in New York a number of years later, how did it leave Oklahoma?  It's true of these

photos as well.  At some point, these photographs left Paraguay to be in the United States.

R., Vol. II, Pt. 2, Tr. at 235.  He also testified that "I don't know how they got to the United States, other than that they left Paraguay in digital form."  *Id.* at 239.

After the close of the government's case, Mr. Dayton moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, based on his contention that the evidence was insufficient to establish the interstate nexus.  The court denied the motion, finding that "there are specific exhibits which have traveled in interstate commerce, or foreign commerce in this particular case."  *Id.* at 253.  But the court took under advisement the question of exactly which images would be submitted to the jury.

The parties revisited this issue at the initial jury instruction conference, where the judge ruled on which images would be submitted to the jury.  The district court granted Mr. Dayton's Rule 29 motion as to "a great number of the images" based on the court's conclusion that, under its reading of *Schaefer*, the government had failed to offer sufficient evidence to prove the interstate commerce nexus.  *Id.* at 311.  However, the court denied the motion as to seven images, concluding that the nexus had been proven as to them.  Those seven images included the three pictures from Paraguay and the four videos downloaded by Agent Cecchini.

Because Agent Trifiletti had testified as to the identity of the three Paraguayan children, and knew that they had never left Paraguay, the district court judge concluded that, "I don't think there's any question" that those three images traveled in interstate

commerce. *Id.* at 313. The court further held that the evidence was sufficient to prove interstate travel as to the four videos. It based that conclusion in part on Agent Cecchini's testimony "that he had downloaded these files . . . from every state but two. And so he had definitely seen th[o]se files on the Internet and from other investigations in other areas." *Id.* at 311, 313–14.

For three out of the four videos, the court not only considered that testimony but also relied on what it considered to be proof that the videos were made outside of the United States. As to the first video, the district court considered the words "cambodian [sic]" and "sex tourist" in the title to be proof that the video was made outside the country; the court also found that the video "ha[d] all the makings and markings of something that was produced in Southeast Asia" because it featured a child who was "obviously Southeast Asian," "an older woman . . . who's obviously Southeast Asian," and "an overweight white person who could be a tourist." *Id.* at 313. As to the second video, which was referred to during the trial as the "baby-sitter abuse tape," the court relied on the fact that the child was speaking a foreign language that sounded like German or Russian. *Id.* at 314. The court found that the third video, the "Vicky" video, had been identified by Agent Cecchini as involving a girl from Richland, Washington, and that the same video had been involved in a case in Virginia. *Id.*

The district court held that the remaining images should not be submitted to the jury because "Cox is located in Oklahoma City, so the government cannot prove interstate travel that way." *Id.* at 315. Moreover, "[t]he government hasn't presented evidence that

any of the files allegedly distributed by defendant moved in interstate or foreign commerce at the time defendant distributed them since [Agent] Cecchini downloaded them from a location in Oklahoma. In fact, they went from Tulsa, Oklahoma to Tulsa, Oklahoma." *Id.* at 316. Moreover, although the court believed that the government could prove the interstate nexus by showing that the image moved in interstate commerce at some point in time, the court interpreted *Schaefer* as requiring a connection between an image to a *specific* out-of-state location or source of origin, and the court found that such a connection had not been established for the remaining images. Under *Schaefer*, the court rejected as insufficient Agent Cecchini's testimony that he had seen the images before on the Internet because that testimony did not link any particular image to a particular out-of-state location.

In denying in part Mr. Dayton's Rule 29 motion, the district court declined to adopt Mr. Dayton's reading of *Schaefer*. The court acknowledged that, under Mr. Dayton's interpretation of *Schaefer*, he would have to be found not guilty of the charges against him because there was no proof that the images traveled in interstate or foreign commerce at the time that the defendant received them from LimeWire and because the distribution from Mr. Dayton to Agent Cecchini occurred wholly within Tulsa, Oklahoma. More specifically, the court refused to read *Schaefer* as "requir[ing] proof that the visual depiction possessed or distributed, moved directly to defendant's computer from an out-of-state location, or moved to an out-of-state location directly from defendant's computer." *Id.* at 317. The district court believed that such a broad

interpretation of *Schaefer* would prevent the federal government from prosecuting child pornography cases.

At the preliminary jury instruction conference, Mr. Dayton also objected to the proposed instruction on the definition of "distribute," which would instruct the jury that a person distributes child pornography when he places it in a shared folder, thereby making it available to others to search out and download in a P2P network. The district court overruled his objection pursuant to *United States v. Shaffer*, 472 F.3d 1219, 1223–25 (10th Cir. 2007).

At the close of the defendant's case, Mr. Dayton renewed his Rule 29 motion. The district court again denied the motion as to those seven images. Those images were submitted to the jury for deliberation, and the jury convicted Mr. Dayton on both counts—possession and distribution—as to all seven images. Thereafter, the court denied Mr. Dayton's motion to suppress, which the court previously had held in abeyance.

At Mr. Dayton's sentencing hearing, the court found that Mr. Dayton had an "extraordinary physical impairment" under the U.S. Sentencing Guidelines Manual ("U.S.S.G.") because he has severe Crohn's disease.[3] The court found that home

---

[3]     Section 5H1.4 provides in relevant part that:

> [p]hysical condition or appearance, including physique, is not ordinarily relevant in determining whether a departure may be warranted. However, an extraordinary physical impairment may be a reason to depart downward; *e.g.*, in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than,

(continued...)

detention would not be appropriate after Mr. Dayton had been convicted. Recognizing

that there was a mandatory statutory minimum of sixty months' imprisonment, the court

decided to grant a downward variance of ten levels, reducing the total offense level from

thirty-six to twenty-six.[4] An offense level of twenty-six, with a criminal history category

of I, corresponded to an advisory Guidelines range of sixty-three to seventy-eight months'

imprisonment.[5] The district court noted that, in granting the downward variance, it had

not only reviewed Mr. Dayton's extensive medical records, but had considered the

sentencing factors enumerated in 18 U.S.C. § 3553(a), including Mr. Dayton's lack of any

prior criminal history. The court sentenced Mr. Dayton to sixty-three months'

---

[3](...continued)
                    imprisonment.

U.S.S.G. § 5H1.4 (2009) (amended 2010).

[4]       Although § 5H1.4 speaks in terms of a downward *departure*, the defendant filed a
motion for a downward *variance*, so the district court chose to vary downward rather than
depart downward. The court noted the inconsistency of that action with § 5H1.4's
reference to a departure, but stated that "whether it's deemed a variance or a departure,
it's appropriate." R., Vol. III, at 123 (Sentencing Hr'g, dated Jan. 12, 2009). *See
generally United States v. Atencio*, 476 F.3d 1099, 1101 n.1 (10th Cir. 2007) ("We now
clarify that when a court reaches a sentence above or below the recommended Guidelines
range through application of Chapters Four or Five of the Sentencing Guidelines, the
resulting increase or decrease is referred to as a 'departure.' When a court enhances or
detracts from the recommended range through application of [18 U.S.C.] § 3553(a)
factors, however, the increase or decrease is called a 'variance.'"), *overruled in part on
other grounds by Irizarry v. United States*, 553 U.S. 708, 713 n.1 (2008).

[5]       This was a significant reduction in the applicable advisory Guidelines range for
Mr. Dayton. Without that downward variance, the advisory Guidelines range for an
offense level of thirty-six, and a criminal history category of I, was 188 to 235 months'
imprisonment.

imprisonment, to be followed by ten years of supervised release. The court allowed Mr.

Dayton to remain free on bond pending placement in an appropriate facility that could

meet his medical needs. This appeal timely followed.

## II. Discussion

On appeal, Mr. Dayton argues that the government offered insufficient evidence of

an interstate nexus to support his convictions for possession and distribution of child

pornography under 18 U.S.C. § 2252(a)(2) and (a)(4)(B). He contends that, under

*Schaefer*, the government cannot satisfy the statutory interstate commerce requirement by

demonstrating that copies of the images—*viz.*, copies of the particular images that are the

subject of the instant criminal charges—at some prior point in time had traveled in

interstate commerce. Mr. Dayton also argues, in the alternative, that the district court

improperly instructed the jury on the element of distribution. In his view, *Shaffer*'s

holding that a person distributes child pornography by making it available to others on a

P2P network is potentially irreconcilable with *Schaefer*'s admonition that more than the

mere use of the Internet is required to prove an interstate nexus. He seeks "guidance and

[a] ruling on what a proper instruction would be given the[se] holdings." Aplt. Br. at 63.

The government responds that it proved that the videos, which Mr. Dayton

indisputably distributed, had been transported in foreign or interstate commerce because

> [a]n FBI agent identified the victim featured in one of the videos as
> "Vicky" from Richland, Washington, and testified that the video had
> been made in Washington. Another of the videos contained ample
> circumstantial evidence to allow a reasonable jury to conclude that it
> was produced in Southeast Asia, and thus to infer that it must have been

- 12 -

transported in interstate commerce prior to its distribution by Dayton.

Aplee. Br. at 14.[6] As to the possession count, the government contends that proof that

Mr. Dayton "possessed digital images that originated in Paraguay was sufficient to

establish that the images must have been transported in foreign commerce to be found in

Oklahoma." *Id.* at 13.[7]

The government maintains that *Schaefer*'s focus on whether a "particular image"

has traveled in interstate commerce is impractical in the digital age. It urges us to limit

*Schaefer* to its facts and to "hold that proof that *an image* originated outside the state in

which it was found is sufficient to establish that it was transported in interstate or foreign

commerce." *Id.* at 15 (emphasis added). More specifically, the government argues that

"[t]his Court should hold that evidence establishing that *an image* traveled in interstate

commerce *at some point in time* is sufficient to establish the jurisdictional element of §

---

[6] The government limits its argument before us concerning the distribution count: it only seeks to establish that the videos concerning "Vicky" and the purported Southeast Asian minor satisfy the statute's jurisdictional nexus. The government emphasizes that it "presented evidence that would have allowed a reasonable jury . . . to conclude that *two* of the videos Dayton distributed were created outside Oklahoma." Aplee. Br. at 26 (emphasis added); *see id.* at 23 ("[T]he government presented sufficient evidence to allow a reasonable jury to find that *at least two* of the videos were produced outside of the state of Oklahoma." (emphasis added)). Notably, although the government mentions the district court's consideration of the video of a minor who allegedly was speaking a foreign language that sounded like German or Russian (i.e., the video described as the "baby-sitter abuse tape"), it does not attempt to defend the district court's decision to send that video to the jury. *See id.* at 23 n.2.

[7] In its jurisdictional argument concerning the possession count, the government exclusively focuses on the three images that allegedly originated in Paraguay.

- 13 -

2252." *Id.* at 37 (emphasis added). In other words, the government contends that the jurisdictional inquiry should not be focused upon whether the *particular* images depicting child pornography—*viz.*, the particular images obtained on digital files in connection with the investigation and criminally charged in this case—traveled interstate (i.e., crossed state lines), but instead on whether the originals of those images, or even any copies of them that depict the same child pornography, traveled interstate. As to Mr. Dayton's argument regarding the jury instruction on distribution, the government maintains that the district court did not abuse its discretion in giving that instruction because *Schaefer* "addressed only the sufficiency of evidence to meet the interstate commerce element of the distribution statute, and did not affect the continuing validity of *Shaffer*'s definition of distribution." *Id.* at 15.

## A. Standard of Review

"Whether the government presented sufficient evidence to support a conviction is a legal question that we review de novo." *United States v. Hasan*, 609 F.3d 1121, 1132–33 (10th Cir. 2010) (quoting *United States v. Parker*, 551 F.3d 1167, 1172 (10th Cir. 2008)) (internal quotation marks omitted); *see also United States v. Cesareo-Ayala*, 576 F.3d 1120, 1125–26 (10th Cir. 2009) (reviewing de novo defendant's challenge to denial of motion for acquittal on sufficiency-of-the-evidence grounds). Under the Due Process Clause, the evidence is sufficient to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v.*

- 14 -

*Virginia*, 443 U.S. 307, 319 (1979).  In reviewing a sufficiency-of-the-evidence

challenge, we "view the evidence in the light most favorable to the government in order

to determine whether all of the evidence . . . together with the reasonable inferences to be

drawn therefrom, convinces us that a rational factfinder could reasonably have found the

appellant guilty of the crime charged beyond a reasonable doubt." *United States v.*

*Burkley*, 513 F.3d 1183, 1188 (10th Cir. 2008) (alteration omitted) (quoting *United States*

*v. Chavez-Palacios*, 30 F.3d 1290, 1293–94 (10th Cir. 1994)) (internal quotation marks

omitted).

## B.  Mr. Dayton's Sufficiency-of-the-Evidence Challenge

We will begin with the issue that we find to be dispositive—whether there was

insufficient evidence that the images Mr. Dayton distributed and possessed had traveled

in interstate or foreign commerce.  Because this issue dictates our resolution of this

appeal, we need not address Mr. Dayton's remaining claim.

Mr. Dayton was convicted of distributing and possessing child pornography in

violation of 18 U.S.C. § 2252(a)(2) and (a)(4)(B).  At the time of Mr. Dayton's

conviction, the statute (which has since been amended)[8] provided in relevant part that a

_____

[8]       The amendment has the effect—as apparently intended by Congress—of
broadening the jurisdictional scope of the child pornography statute.  *See United States v.*
*Lewis*, 554 F.3d 208, 216 (1st Cir.) ("[W]e should note that Congress recently amended
the child pornography statutes, including the one before us, to expand the jurisdictional
coverage.  It did so by replacing all instances of 'in interstate' with 'in or affecting
interstate' commerce. The legislative history indicates that Congress was unhappy with
circuit court decisions narrowly construing the prior statute . . . ." (citation omitted)
(continued...)

- 15 -

person shall be guilty of distributing child pornography if he

> knowingly receives, or distributes, any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer, or knowingly reproduces any visual depiction for distribution in interstate or foreign commerce or through the mails, if—
>
>> (A) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and
>>
>> (B) such visual depiction is of such conduct . . . .

18 U.S.C. § 2252(a)(2) (2006) (amended 2008). It also provided in relevant part that a

person is guilty of possessing child pornography if he

> knowingly possesses 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if—
>
>> (i) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and
>>
>> (ii) such visual depiction is of such conduct . . . .

*Id.* § 2252(a)(4)(B) (2006) (amended 2008).

---

[8](...continued)
(quoting Effective Child Pornography Prosecution Act of 2007, Pub. L. No. 110-358, § 103)), *cert. denied*, 129 S. Ct. 2753 (2009); *see also United States v. Wright*, 625 F.3d. 583, 599 (9th Cir. 2010) ("In 2008, Congress passed the 2007 Act," which was "[b]ased in part on a finding in the 2007 Act that '[t]he transmission of child pornography using the Internet *constitutes* transportation in interstate commerce' . . . ." (alteration in original) (emphasis added) (quoting Pub. L. No. 110-358, § 102(7))).

The distribution and possession sections contain coterminous jurisdictional requirements, namely, that the images "ha[ve] been mailed, or ha[ve] been shipped or transported in interstate or foreign commerce." We must determine whether there was sufficient evidence to satisfy those jurisdictional requirements in this case.[9]

_____

[9] As is evident from the plain language of the statute, there is another way to satisfy the requisite jurisdictional nexus of § 2252(a)(4)(B)—that is, by proving that the images were "produced using materials which have been mailed or so shipped or transported [in interstate or foreign commerce], by any means including by computer." On appeal, the government argues that it also satisfied the jurisdictional requirement for Mr. Dayton's possession charge through testimony at trial that the computer hard drives upon which the images were discovered were manufactured in Thailand. Specifically, Agent Cecchini testified that the two hard drives used by Mr. Dayton were labeled with the phrase "Product of Thailand" or "Made in Thailand." R., Vol. II, Pt. 1, Tr. at 167–68. Thus, the government argues that "because the images were found on a hard drive that was manufactured in Thailand, they were produced using materials that were shipped or transported in foreign commerce." Aplee. Br. at 13–14 (internal quotation marks omitted). *See generally United States v. Schene*, 543 F.3d 627, 639 (10th Cir. 2008) (holding, under plain-error review, where the hard drive was manufactured in Singapore that "[i]t is obvious that the government's evidence was sufficient . . . to show that each 'image of child pornography' had been copied or downloaded to [the defendant's] hard drive in one capacity or another, and was therefore 'produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce.'" (quoting 18 U.S.C. § 2252A(a)(5)(B)).

However, this argument is wholly without merit and may be disposed of in short order. The government failed to charge the materials prong of the statute in the Indictment and, therefore, the jury's verdict could not properly rest on this basis. *See United States v. Rahseparian*, 231 F.3d 1257, 1264–66 (10th Cir. 2000) (explaining that the indictment clearly did not charge the defendant with a particular part of the statute and stating that "it is a fundamental precept of federal constitutional law that a court cannot permit a defendant to be tried on charges that are not made in the indictment" (alteration omitted) (quoting *Hunter v. New Mexico*, 916 F.2d 595, 598 (10th Cir. 1990) (per curiam)) (internal quotation marks omitted)); *cf. United States v. Bishop*, 469 F.3d 896, 902 (10th Cir. 2006) ("If an indictment charges particulars, the jury instructions and evidence introduced at trial must comport with those particulars."), *abrogated in part on*
(continued...)

[9](...continued)
*other grounds by Gall v. United States*, 552 U.S. 38 (2007); *United States v. Gonzalez Edeza*, 359 F.3d 1246, 1250 n.1 (10th Cir. 2004) (explaining that the rule against constructive amendment of the indictment "protects *both* a defendant's right to be subjected only to charges set by a grand jury and his interests in having sufficient notice"); *United States v. Hien Van Tieu*, 279 F.3d 917, 921 (10th Cir. 2002) (same).

The Indictment charged only that Mr. Dayton had possessed images that themselves had been transported in interstate or foreign commerce and contained no reference to the materials prong of § 2252(a)(4)(B). Count Two of the Indictment charged that Mr. Dayton

> knowingly possessed and attempted to possess visual depictions of minors engaging in sexually explicit conduct, as that term is defined in Title 18, United States Code, Section 2256(2)(A)(i-v), to-wit: video files and graphic image files . . . , each of which files had been transported in interstate or foreign commerce by computer, the producing of each of which files involved the use of minors engaging in sexually explicit conduct, and each of which files were of such sexually explicit conduct, in violation of Title 18, United States Code, Section 2252(a)(4)(B).

R., Vol. I, Pt. 1, at 24 (Indictment, filed May 9, 2007). Because Mr. Dayton was not charged with the possession of images that had been "produced using materials which have been mailed or so shipped or transported, by any means including by computer," that conduct simply could not have properly formed the basis for his conviction. Therefore, the government's reliance on that method of proving the requisite jurisdictional nexus must fail.

Moreover, although the government preserved this argument before the district court by objecting to the court's decision not to instruct the jury on the hard drives' Thai origins, we note that the government preserved that objection only when urged to do so by the district court, which was seeking guidance in interpreting Tenth Circuit precedent on this issue. The government admitted that its case really turned on whether the images traveled at some point in interstate or foreign commerce and not on the alleged foreign origin of the hard drives.

- 18 -

In this endeavor, we are guided by two of our prior cases—*United States v. Wilson* and *United States v. Schaefer*.[10]  As we will explain, those cases instruct us to focus upon whether the *particular images* distributed or possessed by the defendant themselves moved in interstate commerce.  *Wilson* involved a sufficiency-of-the-evidence challenge to a conviction under § 2252(a)(4)(B).  182 F.3d 737, 739–40 (10th Cir. 1999).  That case implicated the "materials" prong discussed above.  *See supra* note 9.  The *Wilson* court held that the evidence was insufficient to demonstrate the jurisdictional nexus for which Mr. Wilson had been indicted—that is, "that the visual depictions contained on the [computer] diskettes were produced using materials that traveled in interstate or foreign commerce."  *Id.* at 741 (footnote omitted).  In reaching that conclusion, we rejected a law enforcement agent's testimony "that some of the images at issue *originated* from German magazines" as insufficient to satisfy the jurisdictional nexus requirement.  *Id.* at 744 (emphasis added).  We reasoned that the agent

---

[10]  In an attempt to resolve the question that Mr. Dayton presents in this appeal, the Dissent ventures into the realm of statutory analysis and explores legislative and congressional findings.  This endeavor, however, is misguided.  The Dissent contends that "the critical task in resolving Dayton's jurisdictional challenge is determining precisely what was intended by the statutory phrase 'visual depiction.'"  Dissent at 3.  The Dissent then seeks to accomplish this task by, first, looking to the plain language of the statute's definition of "visual depiction" and, then, to the legislative history and congressional findings purportedly relevant to the meaning of this term.  As the Dissent sees it, this inquiry is analytically necessary.  Under the circumstances surrounding this case, we disagree.  Whether the Dissent is willing to accept it or not, we do not write on a blank slate in addressing the jurisdictional issue that Mr. Dayton raises in this appeal.  As we note in text, our analysis is guided by our prior decisions in *Wilson* and *Schaefer*.

offered no explanation, however, as to how *those particular images* found their way to the diskettes in defendant's possession. Nor did the prosecution otherwise attempt to outline the possible methods by which defendant could have obtained the files through interstate commerce (e.g., obtaining copies of the German magazines and scanning the images into his computer; downloading copies of the images from an out-of-state computer via the Internet or a BBS, etc.).

*Id.* (emphasis added). The *Wilson* court offered the following example to illustrate its point:

Imagine a person possesses a magazine and makes a color photocopy (copy # 1) of one of the images contained therein. Further imagine such person uses copy # 1 to make a second color photocopy (copy # 2). Although the magazine would be a "material" used to produce copy # 1, it would not be a "material" used to produce copy # 2. Thus, the fact that some of the images possessed by defendant originated *at some point* in German magazines does not demonstrate, without more, that the German magazines were actually "materials" used to produce *the images possessed by defendant*.

*Id.* at 744 n.5 (emphasis added). *Wilson* clearly rejected the idea that testimony regarding the foreign (or out-of-state) origins of the original image was sufficient to establish the jurisdictional nexus as to the particular copy of that image that was the subject of the prosecution.

In *Schaefer*, we applied *Wilson* to facts like those present here. In that case, Mr. Schaefer brought a sufficiency-of-the-evidence challenge to his convictions for receiving child pornography and possessing child pornography. 501 F.3d at 1198. There, we held that the jurisdictional nexus requires movement across state lines and that it is not enough to assume that an Internet connection necessarily establishes interstate travel. *Id.* at

- 20 -

1200–01.[11]  We reasoned that, although "in many, if not most, situations the use of the Internet will involve the movement of communications or materials between states[,] . . . this fact does not suspend the need for evidence of this interstate movement."  *Id.* at 1201.  We held that "[a]fter establishing a computer or Internet connection as the method of transport, the government must still prove that the Internet transmission also moved *the images* across state lines."  *Id.* (emphasis added).  *Schaefer* followed *Wilson*'s holding that the government must demonstrate interstate travel for the *particular* images at issue in the criminal prosecution.[12]  We stated that

> even if we assume *arguendo* that the images appearing in the foreign-language movie clips and the image of the young girl originated outside of the State of Kansas (like the images from the German magazine in *Wilson*), the government offered no proof that the particular images on the CDs in question moved across state lines.  In particular, the government offered no proof that Mr. Schaefer accessed the images through an *interstate* Internet connection and either downloaded them directly to the CDs or downloaded them to his computer and later transferred them to the CDs.

[11]  The Ninth Circuit recently interpreted essentially identical language in a pre-2008-amendment child pornography statute in the same way.  *See Wright*, 625 F.3d at 594 ("[S]ection 2252A(a)(1)'s jurisdictional element is focused not on the *means* the defendant uses to mail, transport, or ship child pornography, and *its* connection to interstate commerce.  Rather, it requires that the defendant mail, transport, or ship child pornography interstate."); *see also id.* at 597–98 ("Whether the defendant transported child pornography by mail, by sea, or by computer, the government must still prove it crossed state lines.").

[12]  The Dissent's contention that *Schaefer*'s panel "simply assumed, without directly deciding, that the phrase ['visual image'] referred to specific images possessed by defendant," Dissent at 14, is fatuous at best.  As our analysis makes patent, *Schaefer* squarely held (relying upon *Wilson*) that the focus of the jurisdictional inquiry is on the *particular* image of child pornography possessed or received by the defendant.

- 21 -

*Id.* at 1206; *see also id.* at 1206 n.11 ("Indeed, the government offered no solid proof linking Mr. Schaefer's use of the Internet—whether involving an interstate connection or not—to the pornographic images on the CDs. For example, the government made no effort to show that the *specific images* stored on Mr. Schaefer's computer also appeared on the CDs." (emphasis added)). This hypothetical in *Schaefer* rejects the notion, advocated by the government in this case, that the foreign or out-of-state origin of an image is sufficient to demonstrate an interstate nexus.[13]

---

[13] The Dissent notes that the government's understanding of the statute's jurisdictional requirement—which the Dissent embraces—is "analogous to the manner in which we interpret federal firearms offenses." Dissent at 8 n.5. True enough. But the jurisdictional principles governing firearms statutes do not indicate that we should adopt a different approach here. Indeed, those principles establish the same analytic baseline—*viz.*, whether there is sufficient proof that the *particular* item at issue has crossed state lines. In the case of a firearm, if the government establishes that the particular firearm has crossed state lines at some point prior to the prosecution, it has carried its jurisdictional burden. That fact frequently can be established by mere visual inspection of the firearm itself—with the operative inquiry in that instance being whether this *kind of* firearm is made in the state where it is found; if not, a rational jury could find that it crossed state lines to reach that state. *See, e.g.*, *United States v. Snow*, 82 F.3d 935, 941 (10th Cir. 1996) (noting that the "unrefuted and unchallenged evidence" by a law enforcement agent on direct examination "established there are only two gun manufacturers in Wyoming, neither of which manufacture the type of weapon [the defendant] was charged with stealing and possessing[,]" and that this evidence along with other evidence related to the origin the type of gun was sufficient proof "to establish that at some point the gun had to have crossed state or national lines in order to have been available for sale in Wyoming"); *cf. United States v. Overstreet*, 40 F.3d 1090, 1095 (10th Cir. 1994) (holding that the district court did not abuse its discretion in admitting testimony of a law enforcement agent who "had no knowledge or opinion about the firearm identified in the indictment" but stated that "there are not, and have never been, any manufacturers of revolvers in Oklahoma . . . [and] any revolver used during a carjacking in Oklahoma necessarily travelled in interstate commerce"). Alas, in the

(continued...)

- 22 -

It is patent that our reasoning based upon *Wilson* was an essential foundation of our jurisdictional holding in *Schaefer*; consequently, it is binding upon us here. *See Bates v. Dep't of Corr. of Kan.*, 81 F.3d 1008, 1011 (10th Cir. 1996) ("[A] panel of this Court is bound by a holding of a prior panel of this Court but is not bound by a prior panel's *dicta*."); *see also* Michael Abramowicz & Maxwell Stearns, *Defining Dicta*, 57 Stan. L. Rev. 953, 1065 (2005) ("A holding consists of those propositions along the chosen decisional path or paths of reasoning that (1) are actually decided, (2) are based upon the facts of the case, and (3) *lead to the judgment*. If not a holding, a proposition stated in a case counts as dicta." (emphasis added)).

Therefore, under *Wilson* and *Schaefer* we must determine whether there was sufficient evidence to establish that the particular images stored on Mr. Dayton's hard drives and CDs and accessed by Agent Cecchini through LimeWire themselves traveled across state lines. We do not look to previous copies of those images or even the

---

[13](...continued)
digital context, things are not that simple. By merely examining an image of child pornography, we cannot establish whether that *particular* image, as opposed to a prior iteration of that image, has crossed state lines. More is needed. Therefore, our interpretation of the jurisdictional requirement in the firearms context does not detract from the conclusion that we reach here. In both contexts, the objective of the jurisdictional inquiry is to determine whether the *particular* item at issue has crossed state lines; the evidentiary burden to establish that fact is simply lighter in most instances in the firearms context.

originals of those images, but rather focus our jurisdictional inquiry only on the particular

images distributed and possessed by Mr. Dayton.[14]

The government urges us *not* to follow *Schaefer*. It argues that a subsequent panel

of this court limited *Schaefer* to its facts. *See United States v. Vigil*, 523 F.3d 1258, 1266

(10th Cir. 2008). We are not persuaded by the government's argument. In *Vigil*, a panel

concluded with respect to a prosecution under the Hobbs Act, 18 U.S.C. § 1951(a), that

"[a] rational jury could certainly conclude that Mr. Vigil's acts either actually or

potentially affected interstate commerce." *Id.* at 1267. In reaching that conclusion, the

---

[14]     The Dissent contends that our reading of *Wilson* and *Schaefer* results in the absurd
situation wherein successful child pornography prosecutions are only possible where the
defendant "physically transport[s] the hard drive or CDs containing [the illicit images]
across state lines." Dissent at 10. This argument is specious at best, and is belied by our
own case law. For instance, we recently acknowledged, in *United States v. Dobbs*, the
possibility that a computer user who knowingly accesses images of child pornography
online *may* be found guilty of receipt under 18 U.S.C. § 2252(a)(2), so long as in doing so
he had "the ability to exercise control over them by, for example, clicking on or enlarging
them." 629 F.3d 1199, 1204 (10th Cir. 2011). In such instances, as the Dissent there
recognized, the files created as a result of the defendant's online activity (i.e., the files in
the computer's cache) are not the basis for conviction, per se; rather, they are only
circumstantial "proof" of the crime. *Id.* at 1213 (Briscoe, C.J., dissenting) ("[T]he
existence of copies of the images in the cache of his computer was, like fingerprints left at
the scene of the crime, merely evidence of his actual criminal activity."). Had it been
shown in *Dobbs* that the defendant knowingly viewed these images when on his screen
and had the ability to manipulate them, our decision would have turned on whether the
government also could show that those images arrived on his screen by virtue of an
"Internet transmission [that] moved the images across state lines," *Schaefer*, 501 F.3d at
1201, regardless of whether a distinct file was created on the defendant's computer.
Recognizing this, we believe that nothing in our precedent, or our decision here today,
compels—or, for that matter, supports—the Dissent's peculiar conclusion that, going
forward, only the transportation of physical media containing digital images across state
lines will allow for a successful child pornography prosecution.

*Vigil* court rejected the defendant's reliance on *Schaefer*, finding that "*Schaefer* is distinguishable." *Id.* at 1266. The *Vigil* court distinguished *Schaefer* first by saying, "the court concluded in *Schaefer* that Congress did not intend to exercise its full Commerce Clause power in enforcing the child pornography statute." *Id.* In contrast, the *Vigil* court reasoned that the Hobbs Act *did* involve Congress's full exercise of Commerce Clause power, saying that "[t]he words of the Hobbs Act suggest that Congress intends to use all of its authority under the [C]ommerce [C]lause." *Id.*

The *Vigil* court next compared and contrasted the absence of any evidence regarding interstate commerce in *Schaefer* with the sufficient evidence of interstate commerce before it. *Id.* The court explained that the government's only evidence in *Schaefer* regarding the jurisdictional nexus was that the defendant in that case used the Internet, which did not automatically mean that there was a movement across state lines. *Id.* Based on that limited quantum of proof, the *Vigil* court stated that "*Schaefer* is limited to its facts—the government's say so was not enough to prove that the Internet operates in interstate commerce, no matter how obvious." *Id.* (citing *Schaefer*, 501 F.3d at 1207–08 (Tymkovich, J., concurring)). In contrast, the government in *Vigil* had presented evidence that the defendant's actions had "either actually or potentially affected interstate commerce." *Id.* at 1267.

Viewed in the context of its analysis, we do not read *Vigil*'s description of *Schaefer* as being "limited to its facts" as enervating in any material way the precedential force of *Schaefer*'s child pornography, jurisdictional holding. To some extent, all judicial

- 25 -

decisions are limited to their facts. *See Robinson v. Diamond Hous. Corp.*, 463 F.2d 853, 862 (D.C. Cir. 1972) ("Every case is 'limited to its facts,' if by that phrase one means that the court based its judgment on the facts presented to it. But most cases are also decided with reference to some more general normative principle which extends beyond the specific circumstances of the case before the court. Indeed, it is the existence of such broader norms which distinguishes a decision which is principled and rational from one which is *ad hoc* and arbitrary.").

As a function of common-law decisionmaking, all cases must be viewed as products of their factual context; it is from that context that decisions derive precedential force. *See Allegheny Gen. Hosp. v. NLRB*, 608 F.2d 965, 969–70 (3d Cir. 1979) ("The essence of the common law doctrine of precedent or [s]tare decisis is that the rule of the case creates a binding legal precept. . . . A judicial precedent attaches a specific legal consequence to a detailed set of facts in an adjudged case or judicial decision, which is then considered as furnishing the rule for the determination of a subsequent case involving identical or similar material facts and arising in the same court or a lower court in the judicial hierarchy."), *abrogated on other grounds by St. Margaret Mem'l Hosp. v. NLRB*, 991 F.2d 1146 (3d Cir. 1993); *see also* Jeff Todd, *Undead Precedent: The Curse of a Holding "Limited To Its Facts"*, 40 Tex. Tech L. Rev. 67, 75 (2007) ("To some extent, the process of applying prior cases to current litigation already involves limiting the precedential case to its facts. The holding of a particular case may control the result in future cases, but only those in which the facts are similar to the precedent case in all

relevant respects." (footnote omitted) (internal quotation marks omitted)); Abramowicz &

Maxwell, *supra*, at 1065 (noting that a "holding consists of," *inter alia*, "those

propositions along the chosen decisional path or paths of reasoning that (1) are actually

decided, [and] (2) are *based upon the facts of the case . . . .*" (emphasis added)).

This is particularly true in the federal system because federal courts are

constitutionally forbidden from issuing advisory opinions and are restricted to

adjudicating concrete cases or controversies. U.S. Const. art. III, § 2, cl. 1; *see United*

*Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 89 (1947) ("As is well known the

federal courts established pursuant to Article III of the Constitution do not render

advisory opinions.").

The phrase "limited to its facts" has often been used imprecisely, and courts have

not reached a uniform view as to its meaning. *See* Todd, *supra*, at 68 ("Numerous

appellate courts, both federal and state, have limited—or 'restricted' or 'confined'—a

holding to its facts, and *many more rely upon cases with such holdings*. Although

thousands of decisions have been limited in this manner, the meaning of this curse

remains cloaked in shadow and mist. The courts declare this limitation but do not

describe precisely what it means." (emphasis added) (footnotes omitted)).[15] We

---

[15] Many courts have recognized the continued vitality of cases long-since "limited to
[their] facts." *See, e.g.*, *Holmes v. United States*, 876 F.2d 1545, 1548 (11th Cir. 1989)
(noting that, while the earlier case of *Trujillo v. United States*, 377 F.2d 266 (5th Cir.
1967), had been "limited to its facts," "[n]either the former Fifth Circuit nor the Eleventh
Circuit has reversed the holding in *Trujillo* [and] [t]hus, the ruling remains binding

(continued...)

<sup>15</sup>(...continued)

precedent on this court"); *Davis v. Page*, 618 F.2d 374, 383 n.9 (5th Cir. 1980) (supporting its decision regarding the rights of indigent parents to counsel in Florida child dependency proceedings by reference to the Supreme Court's holding in *Boddie v. Connecticut*, 401 U.S. 371 (1971), which the court recognized "ha[d] been strictly limited to its facts"); *Bacon v. Hennepin Cnty. Med. Ctr.*, No. 06-CV-2359, 2007 WL 4373104, at *9 (D. Minn. Dec. 11, 2007) (noting that there was nothing inherently "unique" about the facts of a decision that had been "limited to its facts," and then applying that decision over a more recent, conflicting appellate ruling based on the principle that the earliest opinion—absent a subsequent en banc or Supreme Court ruling—is binding in the case of an intra-circuit split); *see also Stewart v. Blackwell*, 444 F.3d 843, 859–60, 868 (6th Cir. 2006) (relying extensively on *Bush v. Gore*, 531 U.S. 98 (2000), in determining that Ohio had violated the Equal Protection Clause by failing to utilize uniform voting technologies across the state, despite the Supreme Court stating that its holding in *Bush* was "limited to the present circumstances"), *superseded by* 477 F.3d 692 (6th Cir. 2007), *vacating as moot* 356 F. Supp. 2d 791 (N.D. Ohio 2004); *Focus Inv. Assocs., Inc. v. Am. Title Ins. Co.*, 992 F.2d 1231, 1242–43 (1st Cir. 1993) (relying in large part on the logic of *Phalen Park State Bank v. Reeves*, 251 N.W.2d 135, 141 (Minn. 1977), a decision which the authoring court had itself "limited to the unique facts and circumstances presented in this case," en route to finding that the appellant had standing to raise a usury defense).

To be sure, other courts have a different view. For example, some courts have treated the decision to limit a case to its facts as akin to an implicit overruling. *See, e.g.*, *Schumacher v. United States*, 931 F.2d 650, 654 (10th Cir. 1991) (dismissing the persuasive value of the logic of *McNamara v. Comm'r of Internal Revenue*, 827 F.2d 168 (7th Cir. 1987), a case that had subsequently been "limited to its facts"); *Ingalls Shipbuilding Div., Litton Sys., Inc. v. White*, 681 F.2d 275, 288 n.13 (5th Cir. 1982) ("[S]ince the disposition of *Joyner* is expressly limited to its facts, we do not regard th[is] circumscribed decision[] as creating a precedential rule that controls our conclusion in this case." (internal citation omitted)), *overruled on other grounds by Newpark Shipbuilding & Repair, Inc. v. Roundtree*, 723 F.2d 399 (5th Cir. 1984); *Bacon*, 2007 WL 4373104, at *9 ("To assert that an opinion of an appellate court has been 'limited to its facts' is usually a polite way of saying 'implicitly overruled.'").

This lack of uniformity in how courts have interpreted the phrase "limited to its facts" counsels that it is wise to focus on the specific context in which the language is used. As noted *infra*, based upon a careful examination of the *Vigil* case—the context at issue here—it is apparent that this phrase, as applied to *Schaefer*, does not weaken in any

(continued...)

heretofore have not clarified what we meant in *Vigil* when we referred to *Schaefer* as being "limited to its facts." As an initial matter, it goes without saying that the *Vigil* court was not empowered to overrule—even tacitly or indirectly—our holding in *Schaefer*. *See, e.g.*, *Thompson v. Weyerhaeuser Co.*, 582 F.3d 1125, 1130 (10th Cir. 2009) ("Absent an intervening Supreme Court or en banc decision justifying such action, we lack the power to overrule our own precedent."). Furthermore, the context in which the "limited to its facts" statement was made clearly reveals that the *Vigil* court was merely comparing the absolute lack of evidence in *Schaefer* of an interstate nexus—where the only evidence of such a nexus was "the government's say so," *Vigil*, 523 F.3d at 1266—and the more substantial (and ultimately sufficient) evidence of that nexus in *Vigil*, *see id.* at 1266–67. *Vigil*'s use of *Schaefer* as an "analog[y]," *id.* at 1266, surely cannot mean that we must await the unlikely occurrence of a factually identical case before we can apply *Schaefer*'s jurisdictional holding and reasoning. *See* Comment, *Bush v. Gore and the Uses of "Limiting"*, 116 Yale L. J. 1159, 1162 (2007) ("The use of 'limited by' serves as a caveat and not as an absolute bar to future application of the case. That a case is 'limited by its facts' does not mean that its application is limited only to those facts." (footnote omitted)); *cf. also Hudson v. Palmer*, 468 U.S. 517, 533 (1984) ("While *Parrat* [*v. Taylor*, 451 U.S. 527 (1981),*] is necessarily limited by its facts to negligent deprivations

---

[15](...continued)
material way the precedential force of *Schaefer*'s jurisdictional holding and its supporting rationale.

of property, it is evident . . . that its reasoning applies as well to intentional deprivations of property.").

In any event, the facts to which *Vigil* purportedly limited *Schaefer* formed the bedrock for a legal holding regarding the jurisdictional scope of precisely the same child pornography provisions that are at issue here. Nothing in *Vigil* reasonably could be read to cast doubt on the merits of this jurisdictional holding or *Schaefer*'s interpretation of *Wilson*'s focus on the particular images at issue in a criminal prosecution. We underscore that *Vigil* involved a jurisdictional challenge under the Hobbs Act and not the child pornography statute at issue here. 523 F.3d at 1266. It only commented on *Schaefer* in deflecting the defendant's argument by "analog[y]" that "his actions did not affect interstate commerce." *Id.* Because our court in *Vigil* was not construing the language of the child pornography statutes, and, more specifically, not attempting to discern the scope of their jurisdictional provisions, we cannot conclude that *Vigil* calls into question the soundness of our jurisdictional holding in *Schaefer* and its underlying rationale.[16]

---

[16] We are likewise not given pause by our *unpublished*—and therefore non-precedential—decision in *United States v. Swenson*, which held that there was no plain error in the defendant's conviction for images produced in South America because "[a] reasonable jury could (even if it need not) conclude from this evidence that, for the image to wend its way from South America to Wyoming, it had traveled in interstate or foreign commerce." 335 F. App'x 751, 753 (10th Cir. 2009). *Swenson* ignored *Wilson* and *Schaefer*'s distinction between an original and a copy and the resultant possibility that a defendant could have obtained the *particular* images from *within the state's borders* as contemplated by *Wilson*. Nor are we swayed by the more recent *unpublished* decision in *United States v. Espinoza*, which relied on *Swenson* in what the court deemed a "factually similar case." No. 09-8102, 2010 WL 4739519, at *3 (10th Cir. Nov. 23, 2010).

(continued...)

Accordingly, we review the evidence of the jurisdictional nexus adduced at Mr. Dayton's trial as that evidence relates to the particular images distributed and possessed by Mr. Dayton. First, as to the distribution charge, the government clearly did not prove travel in interstate or foreign commerce in showing that Agent Cecchini (in Tulsa) accessed those images from Mr. Dayton (also in Tulsa) through LimeWire. Although the government knew that Mr. Dayton's ISP was Cox Communications, no evidence was introduced regarding the location of Cox's servers. *Cf. United States v. Sturm*, 560 F. Supp. 2d 1029, 1032–33 (D. Colo. 2008) (denying a motion to dismiss for lack of a jurisdictional nexus because there was evidence that the Colorado-based defendant used AOL to obtain child pornography, that AOL's computer servers were located in Virginia, and any images on the defendant's hard drive must have been routed through AOL's servers in Virginia). On appeal, the government contends that testimony regarding the origins of the original video images is sufficient to establish the interstate nexus. We disagree. It is not enough to say that the (regrettably) well-known victim in the "Vicky" series was from Washington State and that Agent Cecchini had not only seen that video image before in other investigations, but that he had received it from other countries. No evidence was introduced concerning whether the particular video image of "Vicky" *distributed by Mr. Dayton* had traveled in interstate or foreign commerce. Furthermore, we also find insufficient the evidence that one video image *may* have been originally

[16](...continued)
*Espinoza* adopted *Swenson*'s reasoning whole cloth, and in doing so replicated its error.

- 31 -

filmed in Southeast Asia[17] and that Agent Cecchini testified he had seen all of these video images during prior investigations. As in *Schaefer*, "the government offered no proof that the particular [video images] in question moved across state lines." 501 F.3d at 1206. Similarly, the evidence proffered as to the possession charge related only to the origins of the original pictures—*viz.*, Agent Trifiletti's testimony that the victims depicted in those pictures lived in Paraguay and had never left that country. There was no evidence as to how Mr. Dayton obtained the particular pictures he possessed.

Consequently, we must conclude that the government's jurisdictional proof regarding both the distribution and possession counts was insufficient to support Mr. Dayton's convictions under 18 U.S.C. § 2252(a)(2) and (a)(4)(B).[18]

---

[17] The district court's conclusion as to the Southeast Asian origination of the video was based only on the perceived race of the people depicted in the video and the video's titular reference to "cambodian" and "sex tourist."

[18] The Dissent sounds an alarmist call for an en banc proceeding, suggesting that *Schaefer*'s jurisdictional holding is "improperly hampering the prosecution of child pornography cases in this circuit." Dissent at 15 n.9. Putting aside the fact that our task as judges is not to interpret statutes in a manner that best facilitates government prosecutions, but rather in a manner that effectuates Congress's will, we underscore that the impact of *Schaefer*'s holding is necessarily very limited. Congress amended the statute in 2008, effectively broadening the jurisdictional language that was at issue in *Schaefer*. *See supra* note 8. Therefore, *Schaefer* only affects the presumably small number of pending cases that were prosecuted under the pre-amendment statute, and insofar as *Schaefer*'s holding could be viewed as having legally improper effects—a perspective that we reject—those effects will be short-lived. It ineluctably follows that expending the tremendous judicial resources associated with an en banc proceeding with the aim of correcting those short-lived effects would be a dubious undertaking indeed.

## III.  Conclusion

For the reasons discussed above, we conclude that the government presented insufficient proof to establish the requisite jurisdictional nexus under 18 U.S.C. § 2252(a)(2) and (a)(4)(B).  Accordingly, we **REVERSE** Mr. Dayton's convictions and **REMAND** the case to the district court with instructions to **VACATE** its judgment and enter a judgment of acquittal.

ENTERED FOR THE COURT

Jerome A. Holmes
Circuit Judge

No. 09-5022, United States v. Dayton

**BRISCOE,** Chief Judge, dissenting:


I respectfully dissent. In my view, the majority adopts an unnecessarily restrictive interpretation of the statutory phrase "visual depiction," as employed in 18 U.S.C. §§ 2252(a)(2) and (a)(4)(B), and in turn imposes an unduly burdensome level of proof on prosecutors seeking convictions under these child pornography statutes. Properly interpreted, the phrase "visual depiction" refers to the substance of an image of child pornography, and thus encompasses not only the particular digital copy of that image received, possessed, or distributed by the defendant, but also any prior generations of that image (digital or otherwise). Applying that definition in this case, I conclude the evidence presented by the government at trial was sufficient to allow the jury to find that the images at issue were transported in interstate commerce. I also conclude there is no merit to Dayton's challenge to the district court's instruction defining the term "distribute." Thus, I would affirm Dayton's convictions and resulting sentence.

### I. Sufficiency of evidence - interstate commerce

Dayton contends that the evidence presented by the government at trial was insufficient to prove the requisite interstate nexus under the two statutes he was convicted of violating. In reviewing this contention, "we ask whether, viewing the evidence in the light most favorable to the government as the prevailing party, any rational trier of fact

could have found the essential [jurisdictional] element[] of the crime beyond a reasonable doubt." United States v. Hutchinson, 573 F.3d 1011, 1033 (10th Cir. 2009).

Dayton's convictions for distributing and possessing child pornography arose under 18 U.S.C. §§ 2252(a)(2) and (a)(4)(B), which, at the time of his indictment, provided:

> (a) Any person who–
>
> * * *
>
> (2) knowingly receives, or distributes, any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer, or knowingly reproduces any visual depiction for distribution in interstate or foreign commerce by any means including by computer or through the mails, if–
>
>> (A) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and
>>
>> (B) such visual depiction is of such conduct; [or]
>
> * * *
>
> (4) * * *
>
>> (B) knowingly possesses 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if–
>>
>>> (I) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and
>>>
>>> (ii) such visual depiction is of such conduct . . .

- 2 -

shall be punished as provided in subsection (b) of this section.

18 U.S.C. §§ 2252(a)(2) and (a)(4)(B) (2006).  As Dayton correctly notes, both of these

statutory subsections require, as a jurisdictional element, proof that the "visual

depictions" at issue were "mailed . . . or . . . shipped or transported in interstate or foreign

commerce . . . ."[1]  Id.

As I see it, the critical task in resolving Dayton's jurisdictional challenge is

determining precisely what was intended by the statutory phrase "visual depiction."[2]  In

the majority's view, a "visual depiction," in the context of a case like this involving

digital images of child pornography, refers narrowly to a specific graphics file (such as

the files found on Dayton's hard drive and CDs).  Thus, under the majority's view,

identical digital copies of the same image constitute separate "visual depictions" for

purposes of the statute, and each such "visual depiction" must have traveled in interstate

or foreign commerce in order to satisfy the jurisdictional element.  In other words, it

---

[1] The jurisdictional element of 18 U.S.C. § 2252(a)(4)(B) can be satisfied in an alternative manner, i.e., by proof that the visual depictions at issue were produced with materials that were mailed, shipped, or transported in interstate or foreign commerce.  As the majority correctly notes, however, the indictment in this case did not rely on this alternative manner of proving the jurisdictional element.

[2] Although the majority concedes that our task is to "interpret statutes . . . in a manner that effectuates Congress's will," Maj. Op. at 35 n.18, it suggests that the inquiry is foreclosed, and Dayton's jurisdictional challenge controlled entirely, by "our prior decisions in Wilson and Schaefer."  Id. at 20 n.10.  I disagree.  As discussed in greater detail below, neither Wilson nor Schaefer addressed the meaning of the statutory phrase "visual depiction."  Thus, neither is controlling.

- 3 -

matters not that the original version, or an earlier generation copy, of the substantive image has traveled in interstate commerce; instead, the precise copy possessed by the defendant must have traveled in interstate commerce.[3] In contrast, the government effectively suggests that the phrase "visual depiction" refers to the substance of the digital image, and not necessarily to a specific graphics file. In other words, the government suggests, identical copies of the same image constitute the same "visual depiction" for purposes of the statute. Consequently, under the government's view, it is enough to satisfy the jurisdictional element if the original version or prior generation copies of the image at issue have previously traveled in interstate or foreign commerce. See United States v. Vosburgh, 602 F.3d 512, 534 n.22 (3d Cir. 2010) (suggesting, without deciding, that different digital copies of the same image "might be considered the same 'visual depictions,' since they are, for all intents and purposes, the same pictures").

To resolve which of these interpretations is correct, I begin, as I must, with the language of the statute. See Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist., 541 U.S. 246, 252 (2004) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.") (internal quotation marks omitted). The statutory definition of the phrase "visual depiction," as of the time of Dayton's conduct

---

[3] How this could ever be proven, we are left by the majority only to guess. Indeed, the only conceivable way that the precise copy possessed by the defendant could satisfy the jurisdictional nexus would be if it was physically transported (as it resides on some form of media) across state lines.

and indictment, was non-exclusive, stating simply that "'visual depiction' includes undeveloped film and videotape, and data stored on computer disk or by electronic means which is capable of conversion into a visual image." 18 U.S.C. § 2256(5) (2007).[4] Although this definition makes reference to digital images (i.e., "data . . . which is capable of conversion into a visual image"), it does nothing to resolve the question at issue.

I therefore turn to the ordinary meaning of the phrase. See Hardt v. Reliance Standard Life Ins. Co., 130 S. Ct. 2149, 2156 (2010) (noting that courts must assume the ordinary meaning of statutory language expresses the legislative purpose). The term "visual" is commonly defined as "[c]arried out or performed by means of vision," and "an object of vision or sight; capable of being seen; perceptible, visible." Oxford English Dictionary (2d ed. 1989; online version Nov. 2010). In turn, the term "depiction" is defined as "[t]he action of depicting; painted representation, picture; graphic description," and the term "depict" is defined as "[t]o portray, delineate, figure anyhow," and "[t]o represent, as a painting or picture does." Id. Together, then, these terms refer to a

---

[4] The statutory definition of "visual depiction" applicable to Dayton's case originated in 1996, as part of the Child Pornography Prevention Act of 1996. In late 2008, after Dayton was indicted, Congress amended this statutory definition to read:

> "visual depiction" includes undeveloped film and videotape, data stored on computer disk or by electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in permanent format . . . .

18 U.S.C. § 2256(5) (2010).

portrayal or representation that is capable of being seen, i.e., a visually observable image. Unfortunately, however, this again fails to resolve the question at issue.

I thus turn, for further assistance, to legislative history and express Congressional findings. In 1996, Congress amended the statutory definition of "visual depiction" in order to expressly "include stored computer data." S. Rep. No. 104-358, at 10 (1996). In doing so, Congress found that "where children are used in its production, child pornography permanently records the victim's abuse, and its continuing existence causes the child victims of sexual abuse continuing harm by haunting those children in future years . . . ." Congressional Findings, 110 Stat. 3009-26, notes following 18 U.S.C. § 2251 (quoting Pub. L. 104-208) (emphasis added). In 2003, Congress, in an effort to bolster child pornography laws, passed the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act (PROTECT Act). At that time, Congress expressly found that "[t]he vast majority of child pornography prosecutions today involve images contained on hard drives, computer disks, and/or related media." Congressional Findings, 117 Stat. 676, notes following 18 U.S.C. § 2251 (quoting Pub. L. 108-21). More importantly, Congress found that "[c]hild pornography circulating on the Internet has, by definition, been digitally uploaded or scanned into computers and has been transferred over the Internet, often in different file formats, from trafficker to trafficker," and that, consequently, "[a]n image seized from a collector of child pornography is rarely a first-generation product . . . ." Id. (emphasis added).

In my view, the legislative history and Congressional findings firmly support the government's assertion that the original version of an image of child pornography, as well as all subsequent generations of that same image, constitute the same "visual depiction" for purposes of prosecution under §§ 2252(a)(2) and (a)(4)(B). As outlined above, Congress was well aware that images of child pornography, following their initial production (by whatever method), are repeatedly copied, typically digitally, by child pornography traffickers and collectors, and that, as a result, images seized from collectors nowadays are "rarely . . . first-generation product[s] . . . ." Id. In other words, Congress was well aware that it is routine for a single image of child pornography to be repeatedly digitally copied and distributed over the Internet to traffickers and collectors throughout the world. And the difficulty of eradicating all such images is undoubtedly why Congress recognized that an image of child pornography, once produced for the first time, will continue to "haunt" a victim "in future years." Congressional Findings, 110 Stat. 3009-26, notes following 18 U.S.C. § 2251 (quoting Pub. L. 104-208). In turn, that is why Congress expressly found that "[t]he Government . . . has a compelling interest in ensuring that the criminal prohibitions against child pornography remain enforceable and effective." Congressional Findings, 117 Stat. 676, notes following 18 U.S.C. § 2251 (quoting Pub. L. 108-21). In sum, the legislative history and Congressional findings weigh heavily, if not decisively, in favor of the more expansive interpretation of the phrase "visual depiction" urged by the government.

If that were not enough, I further conclude, as a matter of common sense, that the government's interpretation of the phrase "visual depiction" is superior to that of the majority. By treating all copies of the same substantive image as a single "visual depiction," the government's proposed interpretation properly allows courts and jurors to take into account the relevant history of the substantive image, i.e., where it originated and where it traveled prior to the defendant receiving and possessing it.[5] In other words, the government's proposed interpretation allows courts and jurors to consider when the substantive image first entered the "stream of interstate [or foreign] commerce," United States v. Yellow Cab Co., 332 U.S. 218, 228-29 (1947), overruled on other grounds by Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984), and it acknowledges the reality, as Congress has found, that images of child pornography typically remain forever in that stream. In contrast, the majority's position renders irrelevant the prior history of the image; it thus matters not where or how the image itself originated, or how many hundreds or thousands of times the image has been digitally copied and distributed to traffickers and collectors around the world. Instead, the

_____

[5] In this regard, the government's interpretation is analogous to the manner in which we interpret federal firearms offenses. It is well established in federal firearms cases that once a firearm has been shipped or transported in interstate or foreign commerce, the jurisdictional element of the statute is satisfied, and there is no necessity of proving that the firearm was so transported or shipped immediately prior to arriving in the defendant's possession, or that the defendant himself transported or shipped the firearm in interstate commerce. E.g., Barrett v. United States, 423 U.S. 212, 224 (1976) ("conclud[ing] that [18 U.S.C.] § 922(h) covers the intrastate receipt . . . of a firearm that previously had moved in interstate commerce.").

- 8 -

majority's position focuses narrowly, and unreasonably in my view, on the history of the particular digital copy possessed by the defendant. And given what we have learned in this case and others about the creation of digital copies, the unfortunate reality is that the majority's position will effectively stymie the intent of Congress by preventing the prosecution of many child pornography collectors. In this case, for example, it is beyond dispute that "new [digital] copies [of the images at issue] . . . were created in the process of" Dayton both downloading the image files from other LimeWire users' shared folders onto his own hard drive, and in turn saving some of those files onto CDs.[6] United States v. Guagliardo, 278 F.3d 868, 871 n.3 (9th Cir. 2002). In other words, those copies were created at the moment they were recorded on the hard drive and CDs. Consequently, it would have been impossible for those image files to have traveled in interstate commerce during the creation process, thus meaning that they could only be actionable under the majority's interpretation of § 2252(a)(4)(b) if Dayton (or someone else) physically

---

[6] Federal Bureau of Investigation (FBI) Agent Joseph Cecchini testified at trial that at the time the search warrant for Dayton's home was executed, he and another officer interviewed Dayton. According to Cecchini, Dayton admitted he was the subscriber to the Internet account at issue and understood the Internet was "a worldwide entity and information travels worldwide." ROA, Vol. 2, Part 1 at 134. In turn, Cecchini testified, Dayton readily admitted that he used the Internet "for downloading files, movies, pictures, that kind of stuff," id., and had "been downloading child pornography and using LimeWire for about three months prior to us being there." Id. at 135. When asked by Cecchini what he did with the images of child pornography after he downloaded them from the Internet, Dayton "said that he had them for a while. He said some of them, he deleted. He said some of them, he kept and some of them he put onto a DVD or DVDs." Id. at 136.

transported the hard drive or CDs containing them across state lines.[7]  Given the force

---

[7] The majority asserts this conclusion "is specious at best, and is belied by our own case law."  Maj. Op. at 25 n.14.  But the only decision the majority cites in support is its own recent majority opinion in United States v. Dobbs, — F.3d —, 2011 WL 14459 (10th Cir. Jan. 11, 2011).  Dobbs, according to the majority, "acknowledged . . . the possibility that a computer user who knowingly accesses images of child pornography online may be found guilty of receipt under 18 U.S.C. § 2252(a)(2), so long as in doing so he had 'the ability to exercise control over them by, for example, clicking on or enlarging them.'"  Maj. Op. at 26 n.14 (quoting Dobbs, 2011 WL 14459 at *4).  The problem, however, is that the majority decision in Dobbs never delved into the issues we now face, i.e., what is a "visual depiction," and how, precisely, can a visual depiction be shipped or transported in interstate commerce.  Instead, the majority decision in Dobbs focused exclusively on whether the defendant in that case "knowingly received" the images of child pornography that were found in the cache of his computer.  2011 WL 14459 at *4.  Thus, the majority decision in Dobbs tells us nothing about how the jurisdictional element in this or similar cases can be satisfied.

To be sure, the majority in this case now suggests that, "[h]ad it been shown in Dobbs that the defendant knowingly viewed the[] [charged] images on his screen and had the ability to manipulate them, [its] decision would have turned on whether the government also could show that those images arrived on his screen by virtue of an Internet transmission [that] moved the images across state lines, regardless of whether a distinct file was created on the defendant's computer."  Maj. Op. at 26 n.14 (internal quotation marks and citation omitted).  But the majority fails to explain how, precisely, that could be so under its interpretation of the phrase "visual depiction."  If, as the majority concludes, a "visual depiction" refers narrowly to a specific copy of an image found in the defendant's possession, the defendant's online activity in Dobbs simply could not have, for the reasons discussed above, satisfied the jurisdictional element.

Only my dissenting opinion in Dobbs directly addressed the question of how the jurisdictional element in a receipt case under 18 U.S.C. § 2252(a)(2) can be proven.  And, consistent with my position here, I effectively concluded in Dobbs that the original version of an image of child pornography, as well as all subsequent generations of that same image, constitute the same "visual depiction" for purposes of prosecution under § 2252(a)(2).  Consequently, I concluded that the government's proof that the images ultimately found in the cache of the defendant's computer were created out-of-state was sufficient to satisfy § 2252(a)(2)'s jurisdictional nexus.  2011 WL 14459 at *18 ("I conclude that because a reasonable jury could find that the two images at issue traveled in interstate commerce at some point before arriving on Dobbs's computer, there was sufficient evidence to support the jurisdictional element.").

with which Congress has spoken on the issue of child pornography, that is surely not the result it intended.

The majority is mistaken in suggesting that its interpretation is mandated by our prior decision in United States v. Wilson, 182 F.3d 737 (10th Cir. 1999).  Wilson, which I authored, involved a different charge, and in turn a different jurisdictional element, than either of the counts at issue here.  Specifically, the defendant in Wilson was convicted of "a single count of possessing three or more matters (i.e., . . . ten computer diskettes) containing visual depictions . . . of minors engaging in sexually explicit conduct which were produced using materials that had been mailed, shipped, or transported in interstate or foreign commerce, in violation of 18 U.S.C. § 2252(a)(4)(B) (1996)."  182 F.3d at 739-40.  On appeal, the defendant argued that "the evidence presented at trial was insufficient to establish the jurisdictional element of the charged crime, i.e., that the visual depictions were produced using materials that had been mailed, shipped, or transported in interstate or foreign commerce."  Id. at 740.  In addressing this issue, we noted that "the prosecution's strategy at trial for proving the jurisdictional element was extremely vague" and "ever-shifting . . . ."  Id. at 742.  We ultimately addressed and rejected each of those vague theories.  We also noted, in passing, that one of the case agents testified at trial "that some of the images at issue originated from German magazines."  Id. at 744.  In addition to noting that the prosecution failed to rely on this evidence at trial to prove the jurisdictional element, we emphasized that the agent "offered no explanation . . . as to how those particular images found their way to the diskettes in defendant's possession,"

- 11 -

"[n]or did the prosecution otherwise attempt to outline the possible methods by which defendant could have obtained the files through interstate commerce . . . ." Id. at 744. Thus, we "reject[ed] the possibility that [the agent's] testimony regarding the origination of the images, standing alone, was sufficient to satisfy the jurisdictional element" for a charge brought pursuant to 18 U.S.C. § 2252(a)(4)(B), which required proof that the materials used to produce the pornographic depictions were transported in interstate or foreign commerce. Id.

The majority in this case seizes on the following footnote in Wilson:

We offer the following example to demonstrate why [the defendant]'s testimony could not, by itself, satisfy the jurisdictional element. Imagine a person possesses a magazine and makes a color photocopy (copy # 1) of one of the images contained therein. Further imagine such person uses copy # 1 to make a second color photocopy (copy # 2). Although the magazine would be a "material" used to produce copy # 1, it would not be a "material" used to produce copy # 2. Thus, the fact that some of the images possessed by defendant originated at some point in German magazines does not demonstrate, without more, that the German magazines were actually "materials" used to produce the images possessed by defendant.

Id. at 744 n.5. Contrary to the conclusion drawn by the majority, this footnote says nothing about the meaning of the statutory phrase "visual depiction." Indeed, the interpretive question we now face regarding the meaning of that statutory phrase was neither argued nor considered in Wilson. Thus, the above-quoted footnote from Wilson must be read in proper context: it opined only that the German magazines cited by the case agent failed to qualify as "materials" used to produce the specific images possessed by the defendant — which, again, was our focus in this prosecution for violation of 18

- 12 -

U.S.C. § 2252(a)(4)(B). It did not, as suggested by the majority, mandate a particular interpretation of the statutory phrase "visual depiction" or require any type of proof of "interstate travel for the *particular* images at issue in the criminal prosecution." Maj. Op. at 22 (emphasis in original).

As for the other decision relied on by the majority, United States v. Schaefer, 501 F.3d 1197 (10th Cir. 2007), there is no indication that the parties or the panel therein considered the proper interpretation of the statutory phrase "visual depiction." Indeed, the opinion does not even quote the statutory definition of the phrase, let alone attempt to decipher its meaning. Instead, it appears that the panel in Schaefer simply assumed, without directly deciding, that the phrase referred to the specific images possessed by the defendant. Having said that, however, the decision arguably supports, at least to a limited degree, the government's proposed interpretation in this case. In particular, the Schaefer decision at one point states that, "on the[] facts [before it], the government was required to prove that any Internet transmissions containing child pornography that moved to or from [the defendant's] computer crossed state lines." 501 F.3d at 1202. Such proof, however, would not establish that the specific images possessed by the defendant (some of which were contained in "unallocated clusters" and in the "internet cache" on his hard drive, and some of which were contained on a CD) traveled in interstate commerce. Rather, such proof would establish that identical, prior generation copies of the same image traveled by way of the Internet to the defendant's computer, where the copies at issue were then created (in the case of the images on his hard drive, by way of the

- 13 -

computer's internal operations, and in the case of the images on the CD, by subsequent

action of the defendant in copying the images to the CD).[8] In the end, because <u>Schaefer</u>

did not expressly consider the proper interpretation of the phrase "visual depiction," and

because any conclusions that can be drawn therefrom regarding that issue are

inconsistent, I submit the best course (as other panels have done since its issuance) is to

construe it as narrowly limited to its unique facts.[9] <u>See</u> <u>United States v. Vigil</u>, 523 F.3d

---

[8] In short, <u>Schaefer</u> is internally inconsistent: on the one hand, it states that the specific images possessed by the defendant must have traveled in interstate commerce; on the other hand, it suggests that the interstate nexus could be satisfied by proof that identical, prior-generation copies of the images at issue traveled across state lines to the defendant's computer. Unfortunately, neither <u>Schaefer</u> nor the majority opinion in this case acknowledge this inconsistency.

      Moreover, although the majority suggests that the Ninth Circuit agreed with <u>Schaefer</u> when it "recently interpreted essentially identical [jurisdictional] language in a pre-2008-amendment child pornography statute," Maj. Op. at 22 n.11, that is only half-right. To be sure, the Ninth Circuit in <u>United States v. Wright</u>, 625 F.3d 583 (9th Cir. 2010), agreed with <u>Schaefer</u> that a defendant's mere use of an "interstate facility" is insufficient to satisfy jurisdictional language that refers to child pornography or visual depictions being mailed, or transported or shipped in interstate or foreign commerce. <u>Id.</u> at 594. But that is the end of the similarities between the two cases. The remainder of <u>Wright</u>'s jurisdictional discussion focused on the unique language of the statutory provision the defendant in that case was charged with violating, i.e., the pre-2008 version of 18 U.S.C. § 2252A(a)(1). Unlike the receipt, possession, and distribution provisions of § 2252 and § 2252A, which prior to 2008 required proof that the visual depictions or child pornography at issue "ha[d] been mailed, or ha[d] been shipped or transported in interstate commerce," 18 U.S.C. § 2252(a)(2), the pre-2008 version of § 2252A(a)(1) required proof that the defendant himself "knowingly mail[ed], or transport[ed] or ship[ped] in interstate or foreign commerce . . . any child pornography." Thus, in short, <u>Wright</u> said nothing about the proper interpretation of the statutory phrase "visual depiction," or about the jurisdictional elements of §§ 2252(a)(2) and (a)(4)(B).

[9] Having said that, I submit that the instant case is a suitable candidate for reconsidering, en banc, the jurisdictional holdings contained in <u>Schaefer</u> (the government in <u>Schaefer</u> sought only panel, but not en banc, rehearing). As exemplified by this case and <u>Dobbs</u>,

(continued...)

- 14 -

1258, 1266 (10th Cir. 2008) ("Schaefer is limited to its facts–the government's say so was not enough to prove that the Internet operates in interstate commerce, no matter how obvious.").

Concluding, then, that the government's proposed interpretation of the statutory phrase "visual depiction" is the proper one, I turn to the evidence presented by the government in this case to determine whether it was sufficient to satisfy the requisite jurisdictional elements. With respect to the distribution charge, the government presented evidence testimony from FBI Agent Joseph Cecchini that one of the video images that formed the basis of the charge was made in Richland, Washington. In my view, this evidence was clearly sufficient to establish the requisite interstate nexus. That is, taking this evidence in the light most favorable to the government, with all reasonable inferences

---

⁹(...continued)
the jurisdictional holdings in Schaefer are, in my view, improperly hampering the prosecution of child pornography cases in this circuit. For example, the government in this case and Dobbs was needlessly prevented, based upon the holdings in Schaefer, from relying on numerous additional images of child pornography possessed by the defendants. In Dobbs, the government's computer forensic specialist testified that the defendant received approximately 159 images of child pornography. The government's trial evidence in turn focused on seventeen of those images. Ultimately, however, the trial court in Dobbs ruled, based upon Schaefer, that there was sufficient evidence of interstate transport with respect to only two of the images. Although this ruling did not result in the dismissal of either of the two counts alleged against the defendant, it significantly narrowed the scope of each of those counts.

Although the majority suggests there is no need for any en banc proceedings because "Congress amended [18 U.S.C. § 2252] in 2008, effectively broadening [its] jurisdictional language," Maj. Op. at 35-36 n.18, the fact remains that the statute, as currently written, continues to utilize the phrase "visual depiction." Thus, Schaefer and the instant case will, until revisited and reversed by the entire court, continue to impact future child pornography prosecutions in this circuit.

therefrom, a jury could conclude that an image created in the state of Washington necessarily crossed state lines before ultimately arriving on a computer in Oklahoma.[10] See United States v. Schene, 543 F.3d 627, 639 (10th Cir. 2008) (holding that there was sufficient evidence to prove that a hard drive found in Oklahoma was a "material" that had traveled in interstate or foreign commerce upon proof that the hard drive was manufactured in Singapore). The same is true for the possession charge. As to that count, the government presented testimony from FBI agent Christopher Trifiletti that the images found on the CD in Dayton's possession were originally produced in Paraguay. Thus, I reject Dayton's assertion that the government's jurisdictional proof was insufficient to support his convictions.

## II. Jury instruction - distribution

Dayton also argues that the district court erred in instructing the jury on the element of distribution. "When reviewing claims of error in regard to jury instructions, we review the instructions as a whole de novo to ensure that the applicable law was correctly stated . . . ." United States v. Allen, 603 F.3d 1202, 1213 (10th Cir. 2010).

The district court defined the term "distribute" for the jury as follows:

---

[10] Although the government presented evidence of three other video images in support of the distribution charge, it is unnecessary for me to determine whether the government's evidence sufficiently established that those images also traveled in interstate or foreign commerce. See Griffin v. United States, 502 U.S. 46, 56-57 (1991) (holding that when an indictment charges "several acts in the conjunctive, . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged") (internal quotation marks omitted).

- 16 -

In this case, to distribute means to deliver, transfer, disperse, or dispense to another person.  You are instructed that if a person knowingly makes images available on a peer-to-peer file sharing network, such as Limewire, this is considered "distribution" of the images.  In other words, the Government may meet its burden of proof on this element by showing that Defendant knowingly allowed others access to his Limewire shared folder.

ROA, Vol. 1, Part 2, at 240.  In doing so, the district court relied on our decision in

United States v. Shaffer, 472 F.3d 1219 (10th Cir. 2007).

In Shaffer, the defendant was charged with distributing child pornography in

violation of 18 U.S.C. § 2252A(a)(2) by "download[ing] images and videos from a peer-

to-peer computer network and stor[ing] them in a shared folder on his computer

accessible by other users of the network."  472 F.3d at 1220-21.  We rejected the

defendant's argument that to "distribute" requires a defendant to "actively transfer

possession to another."  Id. at 1223.  We held instead that the defendant "distributed"

child pornography by allowing others access to download the child pornography files in

his peer-to-peer program's shared folder.  Id. ("We have little difficulty in concluding that

Mr. Shaffer distributed child pornography . . . . [H]e freely allowed [others] access to his

computerized stash of images and videos and openly invited them to take, or download,

those items.").

Although Dayton contends the district court erred by instructing the jury according

to Shaffer, and a correct instruction would have relied instead on Schaefer, I disagree.

Schaefer, as already discussed, focused exclusively on the jurisdictional nexus (the

interstate commerce element) for charges of receiving and possessing child pornography.

- 17 -

See Schaefer, 501 F.3d at 1198. Nothing therein addressed distribution of child pornography in general, or the definition of "distribution" in particular.

Dayton's argument that the jury instruction "permitted a less stringent evidentiary foundation to prove the interstate commerce nexus," Aplt. Br. at 62, is wholly without merit. Distribution and jurisdiction are independent elements: the government was required to prove that Dayton knowingly distributed the visual depictions and that those visual depictions had previously traveled in interstate or foreign commerce.[11] Notably, the district court in this case separately and clearly instructed the jury on both of those elements.

I would affirm Dayton's convictions and sentence.

---

[11] Dayton appears to suggest that the government was required to prove that he distributed the files in interstate or foreign commerce. However, that is not what the statute requires. Section 2252(a)(2) prohibits "knowingly . . . distributing . . . any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce . . . ." (emphasis added). Thus, it is not necessary that Dayton's distribution was itself in interstate or foreign commerce.